## CHARLIE STANFIELD v. STATE.

No. A-1578.    Opinion Filed June 6, 1912.

(123 Pac. 1033.)

1. APPEAL—Weight of Evidence. The jury are the exclusive judges of the weight of the evidence and the credibility of the witnesses; and, where there is any evidence in the case from which the jury could legitimately reach the conclusion that the defendant is guilty, their verdict should not be disturbed upon the ground of the insufficiency of the evidence, unless it appears from the record that the jury were influenced by improper motives in arriving at the verdict.

2. LARCENY—Sufficiency of Evidence. For statement of evidence which fully sustains a verdict of guilty for grand larceny, see opinion.

(Syllabus by the Court.)

*Appeal from District Court, Muskogee County;*
*R. P. De Graffenreid, Judge.*

Charlie Stanfield was convicted of larceny, and appeals. Affirmed.

*De Roos Bailey, J. E. Wyand,* and *Charles A. Moon,* for appellant.

*Smith C. Matson* and *R. E. Gish,* Asst. Attys. Gen., for the State.

FURMAN, P. J. But one question is presented in the brief of counsel for appellant, and that is summed up in the closing statement of the brief as follows:

"The testimony of the defendant and of Will Lindsley explained defendant's possession of the saddle. This testimony was reliable as far as the record shows, and should have been given full weight and credit under the instructions of the court, but the jury saw fit to arbitrarily ignore the testimony of the defendant and his witnesses and to convict him."

In this case a number of witnesses were introduced for the state and two for appellant. It was proven on behalf of the state: That the saddle in question was stolen the last of April, 1908, from the barn of Jack Stewart, about five and one-half miles from the town of Haskell, in the county of Muskogee; that the saddle was taken one night, during which it rained; that next morning when the saddle was missed, on an examination of the premises, tracks were found leading from the premises from which the saddle was taken down to the creek nearby. These tracks were made by square-toed boots. These tracks were apparently made by a No. 7 boot. That appellant and the owner of the saddle met in the town of Haskell the evening before the saddle was stolen. That the owner of the saddle then had the saddle with him. That appellant at this time had on a pair of square-toed boots and was riding a buckskin pony.

J. I. Brown testified for the state as follows:

"Q. What is your name? A. J. I. Brown. Q. Where do you live? A. One and three-quarter miles southwest of Mounds. Q. Known as Ira Brown? A. Yes, sir. Q. Did you live there in 1908? A. Yes, sir. Q. Where were you the last of April or the 1st day of May? A. I was home. Q. Who was there, Mr. Brown? A. I couldn't tell you who was there along about that time. Along about the 1st of May there was a fellow on a buckskin pony. Q. Did he have a saddle? A. Yes, sir. Q.

You may describe it. A. A new looking saddle. Had a buckskin rawhide horn. Q. A big saddle? A. Yes, sir; looked like a $45 or $50 saddle. Q. What conversation, if any, did you have with the man? A. Well, he asked my children if he could get feed for his pony, and we were drilling an oil well on my place about 300 yards below my place, and the boys came running up there, and wanted to know if the man could feed his pony, and I walked up there and he asked me and I said he could, and he said he was sleepy and he went to sleep, and I and Mr. Stewart went over to see a strawberry patch, and, when we came back, he was gone. Q. Do you know of Albert Cox and Jack Bray being at your place? A. Two men come over there and got a gun. I didn't see them. Q. What day was that? A. Some time a few minutes before the children came down and said the man wanted to feed his pony. I was there drilling the oil well, and the children came down and said the man wanted to feed his horse. Q. How far did you live from Haskell? A. Thirty-five miles. Q. What time of the day was that? A. Two or 2:30. Q. Can you identify that man positively? A. Just seen him there talking with him about five minutes, that is all. Q. Do you see the man in the courtroom? A. That fellow there resembles the man, but I don't know positively it was him. Q. What man is that? A. Right at the end of the table [pointing at the defendant], but I can't say whether it was him. Q. Do you know what direction he went? A. No, sir; he crossed the creek there."

Lewis Harrison testified as follows for the state:

"Q. What is your name? A. Lewis Harrison. Q. Are you the same Lewis Harrison that was on the witness stand a while ago? A. Yes, sir. Q. Where were you the last of April or the 1st of May, 1908? A. Going over in the timber after a load of wood, three and one-half miles from Mounds, maybe two and one-half miles. Q. Did you learn — please state to the jury whether or not you learned of Harry Rowley losing a saddle there at Haskell? A. No, sir; not that day, but I saw a saddle there and a mule and a pony over there in the road. Q. Did you learn afterwards of Harry Rowley losing a saddle? A. No, sir; didn't hear that name until today, heard a saddle was lost. Q. With reference to the time you heard the saddle was lost, what day was that you saw the man with the pony, the saddle and the mule? A. Along about the last of April or 1st of May. I don't remember the date exactly, but that was when I saw the saddle, the man, and the mule. Q. Was it after the day you learned the saddle was

taken? A. Before; I had not heard anything about the saddle being taken. Q. I wish you would describe the horse you saw. A. Buckskin pony, guess about fourteen and one-half hands or three inches high, had a new saddle on, around the saddle there was—I feel positive it had a raw hide buckskin plaited horn. Q. What kind of a mule was that? A. Dark brown mule. I would call it a kind of a mouse color. Q. Where was it? How far from Ira Brown's place? A. I was three-quarters of a mile west or a half mile south. Q. Did you say there was a man with this mule, saddle, and horse? A. He was lying down beside a fence. Q. Did you see him? A. No, sir; he had his hat over his face, could see part of his face, and a little of his hair. Q. What was he doing? A. Supposed to be asleep. Thought he was asleep."

It was proven that the saddle in the possession of appellant was recovered and returned to the owner and identified as the stolen saddle. Appellant took the stand as a witness in his own behalf, and attempted to account for his possession of the stolen saddle as follows:

"Well, sir, along about that time, when I was living out there, I went up to Mounds, and was monkeying around there, went over to Keefeton. Now I was up there in that country around Mounds one morning, me and another boy had been drinking around there, and a negro came walking up to sell me a saddle, and I said I did not want to buy any, but 'I will trade you.' I talked around a little bit. Finally I told him that I would agree to trade with him. I suppose, if I had not been drinking, he would not have asked me anything about it. Q. Tell what was said and done? A. He asked me $20 to boot. I offered him $5. Finally I agreed to give him $5. He said he would take $5 if I would throw in the saddle and bridle, and I agreed to do it."

It is true appellant was corroborated by one witness in his statement as to how he got possession of the saddle, but we think that their testimony was in every way unsatisfactory and covered with suspicion, and the testimony of the state's witnesses fully warranted the jury in rejecting it. This case is covered with the brands and fleshmarks of grand larceny. There is no question at all about this man's guilt, and there is no pretense that his trial was not in every way legal. After the stolen saddle was recovered from his possession and returned to its owner. ap-

pellant was arrested, charged with the theft of the saddle. The day before his case was to come up for preliminary trial, he left the state of Oklahoma, forfeited his bond, and went to Texas and remained there about a year. He was finally arrested in Texas, and brought back to Oklahoma. Under these circumstances, the jury were fully warranted in convicting appellant. His statement that he bought the saddle from an unknown negro is exceedingly improbable, and the jury were fully warranted in rejecting it.

The judgment of the lower court is in all things affirmed.

ARMSTRONG and DOYLE, JJ., concur.