## JOHN OSTENDORF v. STATE.

No. A-1664.   Opinion Filed November 30, 1912.

(128 Pac. 143.)

1. COURTS — Evidence—Indictment and Information—Appeal—Determination—Written Opinions—Circumstantial Evidence—Indictment—Time—Descriptive Averments—"Separate Offense." (a) When an appeal is taken to this court, it is the duty of counsel for appellant in his brief to point out the specific alleged error upon which he relies, and to make the best argument he can to show that the trial court erred in the matter complained of, and that by this error his client was deprived of a substantial right, to his injury.

(b) When a defendant is clearly proven to be guilty, this court will not reverse a conviction upon any technicality or exception which did not affect the substantial rights of the defendant.

(c) This court is not required to prepare written opinions in misdemeanor cases, unless in its judgment this should be done. See Session Laws 1910, c. 13. It is our custom in misdemeanor cases, when we find that no substantial error has been committed in the trial of a cause and that the evidence clearly shows that the appellant is guilty, to affirm a conviction in an oral opinion.

(d) This court has never made any distinction as to circumstantial evidence, or in its application of the principles of law, between misdemeanor and felony cases, or between classes of misdemeanor cases.

(e) Except in cases where time is of the essence of an offense, it may be alleged in the information or indictment, and proven upon the trial, at any time prior to the institution of the prosecution, and the state is not bound by the date alleged in the information or indictment.

(f) When time is not of the essence of an offense, the state is not confined in its proof to any specific date; but it may be proven at any time within the statute of limitations, and in such

cases a conviction or acquittal will operate as a bar to a subsequent prosecution for this offense at any time prior to the filing of the information or indictment.

(g) Where a crime constitutes a continuing offense, each day during which it is continued constitutes a separate offense, and will support a separate prosecution, provided the information or indictment alleges such specific day, and the state confines its proof to the date alleged.

(h) In an information or indictment for maintaining a place at which intoxicating liquors are illegally sold, it is not necessary to go into immaterial details in describing such place. It is enough to state the offense in such language as will enable a person of ordinary understanding to know what is intended to be charged against him. If the indictment or information contains unnecessary descriptive allegations, such averments will constitute surplusage, and a failure to prove those as alleged will not amount to a fatal variance.

(i) Descriptive averments only become material when they involve the merits of the case. The common-law rule with reference to descriptive averments as to immaterial matters is not in force in this state.

2. **ATTORNEY AND CLIENT**—Preliminary Proceedings—Motion to Strike Witnesses—Duty of Attorneys. (a) Where the record shows that the defendant announced ready for trial, and that after the jury had been impaneled and sworn, and jeopardy had attached, the defendant made a motion to strike the names of certain witnesses from the back of the indictment or information, which were there when he announced ready for trial, upon the alleged ground that they were placed there after the indictment or information was filed in court, and without permission of the court, such motion comes too late and should be overruled.

(b) Where a witness has been improperly allowed to testify in a case, and the defendant is surprised thereat, he should promptly withdraw his announcement of ready for trial and file a motion for a continuance, in which he should set up the facts which constitute such surprise, and also state how he would be injured by the reception of such testimony, and why he should have additional time for preparation for trial on account of such testimony, and what evidence, if any, he could produce, if given such time, to rebut the testimony of such witness. A failure to do this constitutes a waiver of objections to the testimony of such witness.

(c) It is the duty of lawyers to do everything that is fair and legal to protect the substantial rights of their clients, and in so doing they should be upheld by the courts; but it is a very low estimate, and one which greatly dishonors the profession of law, to assume that courts are established merely for the convenience of lawyers, and to enable them to make money by the practice of law. Courts are established solely for the purpose of enforcing justice, and thereby protecting society, and they should be conducted with an eye single to the interest of the entire people.

(d)  As long as lawyers disregard the oft-repeated requirement of this court that they must try their cases upon their actual merits, and persist in quibbling over mere trifles, which are only shadows, cobwebs, and flyspecks on the law, and present questions to this court which are purely technical, we will continue to condemn such practice, it matters not who the attorneys may be; for we are determined, if possible, to break it up in Oklahoma. Our purpose is to elevate the practice of law in Oklahoma, and make lawyers, and not quibblers, out of those who try such cases. The only questions which this court desires to have submitted to it are those which involve the actual merits of a case.  This does not include the presentation of jurisdictional questions, which cannot be waived, and which are always in order, and which may be raised at any time.

3.  INTOXICATING LIQUORS—Illegal Sale—Maintenance of Place —General Reputation—Duty of County Attorney.  (a)  Where a defendant is charged with keeping and maintaining a place at which intoxicating liquors are sold or illegally disposed of, it is competent for the state to prove the general reputation of such place in such community touching this matter, and that it was a place where persons who were in the habit of drinking intoxicating liquors congregated during the week and on Sundays.

(b)  If prosecuting attorneys would enforce the oft-repeated declarations of this court on this question, it would be an easy and inexpensive matter for them to close every known bootlegging joint in Oklahoma.

(c)  Where a defendant is charged with maintaining a place at which intoxicating liquors are illegally disposed of, he cannot complain because evidence is admitted that prior to his occupancy of such place it had the general reputation in that community of being a notorious bootlegging joint, where the testimony also shows that he moved into this place with knowledge of such reputation, and that he took no action to counteract this previous reputation, but availed himself of it as a means of advertising his business and securing customers.

4.  SAME—Appeal—Review—Evidence—Circumstantial Evidence.  (a) Before this court will reverse a conviction upon the ground that the verdict of the jury is contrary to the evidence, we must find that there is no testimony in the record from which the jury could rationally conclude that the appellant was guilty, unless it appears from the record that the jury were influenced by improper motives in arriving at their verdict.  This has always been the rule of this court.

(b)  For circumstantial evidence which fully sustains a verdict of guilty, where the defendant was charged with maintaining a place where intoxicating liquors were illegally disposed of, see opinion.

5.  WITNESSES—Perjury—Examination—Leading Questions—Hostile Witness.  (a)  It is a settled rule of law that leading questions should not be asked a witness by the party placing him upon the stand.  It is equally well settled that the trial judge should carefully abstain from expressing any opinion as to the truthfulness

of the witness, and from in any manner reflecting upon his testimony.

(b)    Where a witness proves hostile to the party placing him upon the stand and friendly to his adversary, the trial court may in its discretion relax the general rule of law and permit leading questions to be asked such witness.

(c)    Where the trial court permits leading questions to be asked a hostile witness, and such witness persists in attempting to evade answering such questions, it is the duty of the trial court to reprimand such witness, and, if necessary, to punish him for contempt of court.

(d)    Where a witness is sworn to testify in a case, and he willfully suppresses the truth, such conduct is just as criminal in morals and in law as the affirmative statement of a falsehood, and renders such witness liable to prosecution for perjury. County attorneys of Oklahoma are instructed to prosecute all such persons vigorously, without regard to the character of the case in which the perjury is committed.

6.    TRIAL — Prosecuting Attorney—Address to Jury. For remarks made by the prosecuting attorney in his closing speech, which were justified and sustained by the record, see opinion.

7.    TRIAL—Instructions. Instructions must always be considered in connection with the evidence in the case, and where they contain no fundamental error nor any misstatement of law which in the light of the evidence was calculated to mislead the jury to the injury of the defendant, and where the evidence clearly shows that the defendant is guilty, a conviction will not be reversed because the charge of the court may not be technically correct.

(Syllabus by the Court.)

*Appeal from Garfield County Court;*
*Winfield Scott, Judge.*

John Ostendorf was convicted of violating the liquor law, and he appeals. Affirmed.

On the 5th day of February, 1912, judgment was rendered in the county court of Garfield county against appellant for a violation of the prohibitory law of Oklahoma, and his punishment was assessed at a fine of $250 and 150 days' confinment in the county jail at hard labor.

*F. E. Chappel,* for appellant.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

FURMAN, P. J.    Counsel for appellant has displayed great ingenuity and industry in the presentation of his case, and has

evidently spent a great deal of time and expended much labor in preparing his brief. It appears that upon the trial of this case counsel relied alone upon a technical defense, without regard to the guilt or innocence of his client. He interposed objections to everything that was done in the trial court. He demurred to the information, which was overruled. When the case was tried, he objected to the introduction of any testimony, upon the ground that the information did not charge any offense against the laws of Oklahoma. Every conceivable objection was offered to each question asked every witness in the case. Counsel for appellant was evidently fishing with a grabhook and seining with a dragnet, hoping that by some lucky chance he might catch onto an unforseen and unknown error, and thereby secure the reversal of a conviction. In some states this practice may be beneficial, but it has directly the opposite effect in this state. If it does not in effect amount to a plea of guilty, it at least shows clearly that counsel was relying alone upon a technical defense, and that he was seeking to place the burden on this court of looking through a bushel of chaff to see if we could find a single grain of wheat therein, or of hunting through a haystack to see if we could find a needle. We have time and again condemned such practice. Counsel has nowhere in his brief attempted to show that any alleged error has deprived his client of a single substantial right to his injury. This case presents the same "Cyanide" defense which was condemned in the case of *Steils v. State*, 7 Okla. Cr. 391, 124 Pac. 76. We recommend that all of the lawyers in the state who try criminal cases carefully read and consider the Steils case. If counsel had kept himself informed as to what this court has decided, he would have saved himself a great deal of useless labor and trouble.

In the early case of *George v. State*, 1 Okla. Cr. 307, 97 Pac. 1052, 100 Pac. 46, in an opinion by Judge Doyle, we said:

"When a defendant is clearly proven to be guilty, this court will not reverse a conviction upon any technicality or exception which did not affect the substantial rights of the defendant."

We have reiterated this statement in hundreds of cases and wherever it has been presented to us since, and it has been our

uniform rule to require the defendant to put his finger on the error of which he complains and to show that he was thereby deprived of some substantial right.    This question has been so often passed upon that at least those who profess to be lawyers should know what the court has decided and should govern themselves accordingly in the preparation and presentation of their cases.   This case should be affirmed without a written opinion, as is authorized by the act of February 18, 1910.   See Session Laws 1910, p. 18.   But as some persons whose duty it is to keep up with the decisions of the courts of the state refuse to inform themselves as to what the decisions of this court are, but persistently act in direct disregard of what has been expressly decided, we will take up this record and decide every question therein presented as though it were of first impression, but in doing this we will quote from previous opinions.

It has long been the custom of this court to advance liquor cases on our docket, and the lawyers who appeal such cases are again notified that they must show upon the actual merits of each case that a reversal should be entered, or that the record contains a jurisdictional defect, or the judgment of the lower court will be affirmed without a written opinion.   For the reasons of this rule see *Tucker v. State,* 7 Okla. Cr. 634, 125 Pac. 1089.

We do not make any distinction in the principles of law applicable to different classes of cases.   In the case of *Fletcher v. State,* 2 Okla. Cr. 312, 101 Pac. 599, 23 L. R. A. (N. S.) 581, in reply to the contention that a different rule should apply to those offenses which violate the personal rights of others and those offenses which do not violate the personal rights of others this court in express language repudiated the contention and held that it was "unsound," and we have always held to the doctrine that no distinction should be made in the application of the principles of law to different classes of cases.   The reason why we advance liquor cases on our docket is because we found that great numbers of appeals were being taken in such cases in which there was no merit, and which were being taken simply for delay.   This case and the Steils case, hereinbefore quoted, are but samples of hundreds of others which have been affirmed without written

opinions.   Something had to be done to check this evil, which caused great expense to the state and delay in the punishment of criminals and the enforcement of justice.   So we advance those cases and dispose of them as soon as possible.   This has had a most beneficial effect, and appeals of this sort have decreased over 50 per cent. since this rule has been adopted.

We will now proceed to discuss the questions presented by this record.

First.   On the 28th day of March, 1911, the following information was filed in the county court of Garfield county:

"State of Oklahoma, Garfield County—ss.: I, the undersigned, county attorney of Garfield county, Oklahoma, in the name, by the authority, and on behalf of the State of Oklahoma, give information that on the_____day of February, A. D. 1911, in said county of Garfield.and the state of Oklahoma, one John Ostendorf did then and there unlawfully and willfully keep and maintain a place on 205 N. Ind. Ave., lot 22, in block 22, Johnsville addition, Enid, Oklahoma, where malt, {spirituous, vinous, and fermented liquors and imitations and substitutes therefor, to-wit: whisky and beer capable of being used as a beverage, were received and kept for the purpose of bartering, selling, giving away, and otherwise furnishing the same to others, unlawfully, contrary to the form of statute in such case made and provided and against the peace and dignity of the state of Oklahoma.

"CHARLES N. HARMON, County Attorney.

"State of Oklahoma, Garfield County—ss.: I do solemnly swear that the allegations set forth in the within information are true; so help me God.

"CHARLES N. HARMON.

"Subscribed and sworn to before me this 25th day of March, 1911.

"MARVEL HUDSON,

[Seal]                                                    Notary Public.

"My commission expires October 13, 1914."

On the 1st day of May, 1911, the following demurrer was filed to this information:

"In the County Court of Garfield County, Oklahoma.   State of Oklahoma, Plaintiff, v. John Ostendorf, Defendant.   No. 2118. Demurrer.   The defendant in the above-entitled cause demurs to the information filed in said cause for the reason the said

information does not state facts sufficient to constitute a public offense.

"F. E. CHAPPEL, Attorney for Defendant."

Which demurrer was by the court overruled. The fact that the information charged that the offense was committed on the _____ day of February, 1911, is immaterial, and does not in any manner affect the sufficiency of the information. Time is not of the essence of such an offense as this, if it be alleged to have been prior to the filing of the information. This question is settled by our statute. Section 6700, Comp. Laws 1909, is as follows:

"The precise time at which the offense was committed need not be stated in the indictment; but it may be alleged to have been committed at any time before the finding thereof, except where the time is a material ingredient in the offense."

But, even if the information should have stated the precise day of the offense, the manner in which it is charged in the information would be an error favorable to the appellant, because keeping and maintaining a place where prohibitory liquors are sold is a continuing offense, and where the state elects to prosecute such a case, without specifying the particular day on which the offense was committed, this will be a bar to a subsequent prosecution for the same offense on any day prior to the filing of the information. If an error was committed in this respect, instead of injuring the appellant, it inured to his benefit, because it protects him against any other prosecution for the same offense committed prior to the filing of the information; whereas, if the information had charged a specific date, and the state's proof had been confined to that day, a subsequent prosecution could have been maintained for every other day upon which the evidence might show that the appellant had kept such place.

The only defect which we find in this information is that it states with unnecessary particularity the place where the offense is alleged to have been committed. This was altogether unnecessary, and surplusage. Who would say, in case an information alleged that the defendant stole a horse tied to a certain post in a certain street, and if the testimony upon the trial shows that as a matter of fact the horse was not taken from this particular

post, that the allegations with reference to the post and street were necessary, and therefore not surplusage? Such a variance would be immaterial. There was a time at common law when technical objections of this sort were held valid; but when this rule was established the defendant in a criminal case was not allowed the benefit of counsel or permitted to examine witnesses or testify in his own behalf, and did not have many rights and safeguards which are enjoyed by every defendant now. Therefore the law then provided every possible technical defense, and made it the duty of the judges who were charged with the duty of representing defendants to enforce them. These conditions have long since passed away, and it would be just as reasonable now to enforce those old technical rules of the common law in the trial of cases as it would be to retain the barbarous and inhuman doctrine of the common law that a husband had the right to whip his wife, and also the doctrine of imprisonment for debt, and the burning of women as witches, and the enforcement of *ex post facto* laws and bills of attainder, the re-establishment of whipping posts and ducking stools, and many other ancient absurdities and monstrosities, all of which were parts of the common law. We have time and again announced that law is a progressive science, and that it should keep even step with the march of civilization and the changing conditions of men in their relations with each other, and that Oklahoma should be ruled by the living, and not by the dead, and that we will not adopt or follow any rules of the common law or the decisions of any courts unless we know and approve the principles upon which they are based. See *Slater v. United States,* 1 Okla. Cr. 275, 98 Pac. 110, and every other case which we have decided where this question was referred to.

We cannot see how any man of ordinary understanding and intelligence can fail to know, from the allegations in the information in this case, the nature of the accusation against the appellant. This is all that our law requires. Subdivision 6, sec. 6704, Comp. Laws 1909, is as follows:

"The indictment is sufficient if it can be understood therefrom * * * that the act or omission charged as the offense

is clearly and distinctly set forth in ordinary and concise language, without repetition, and in such manner as to enable a person of common understanding to know what is intended."

We think that the information in this case is sufficient, and that the court did not err in overruling the demurrer thereto, and in admitting evidence thereunder.

Second. The record shows that, when the information in this case was filed in court, the name of E. H. Walters and Grimes Groat were indorsed on the back thereof as witnesses for the state; that thereafter, on the 16th day of January, 1912, the following request was made by the county attorney of the county judge:

"State of Oklahoma, Plaintiff, v. John Ostendorf, Defendant. Praecipe. Case No. 2,118. The judge of the court will issue subpoenas in the above-entitled action for E. H. Walters, Grimes Groat, Attorney L. C. McClain, and Photographer Kamrath, and Glen Walters, Mrs. Wamsley, for the state, returnable Monday, January 22, 9 a. m. Direct to the sheriff of the county of Garfield, Oklahoma, and returnable according to law.

"CHARLES N. HARMON, Co. Atty."

When the case was called for trial on the 22d day of January, 1912, the names of the following witnesses were found to be indorsed on the back of the information: E. H. Walters, Grimes Groat, L. C. McClain, ———— Kamrath, Glen Walters, Mrs. Wamsley. The record fails to show when the names of the last four witnesses were placed on the back of the information. The record also shows that the county attorney, the appellant, and his counsel, all appeared, and that both sides announced ready for trial, and that after the jury was called and sworn, and after the county attorney had made his opening statement, and counsel for appellant had declined to make any statement, and the court had directed the state to call its witnesses, the following took place:

"Mr. Chappel: I move to strike from the information the names of the last four witnesses indorsed thereon, for the reason that the same are not originally indorsed upon the information at the time of the filing, and that they have not been indorsed thereon since the filing of the information by order of the court; but, if so done by order of the court, without notice to the defendant.

"Mr. Harmon: At this time the state asks permission to indorse the names of the last four witnesses: L. C. McLain, ——— Kamrath, Glen Walters, and Mrs. Wamsley.

"Mr. Chappel: To which the defendant objects, for the reason that the trial of the case has already begun."

The court overruled the objection and directed that the trial proceed. The names of the witnesses objected to were on the back of the information when the trial began. There is no claim made that the appellant was surprised, and did not know that the names of such witnesses were on the back of the information at the time when he announced ready for trial, and that he would not have announced ready for trial if this fact had been known to him, or that indorsing these names on the back of the information required the appellant to make any further preparation for trial, and that there was any evidence which he might obtain to counteract or impeach their testimony. There being no showing of any injury to appellant, or that he suffered any surprise in this matter, we think that the motion came too late. To hold this motion good now would be to permit counsel to juggle with justice and play with loaded dice. Counsel must be prompt and vigilant in protecting the rights of their clients. If counsel remain silent, and allow an error to be committed which could have been avoided if they had promptly asserted their rights, they cannot afterwards be heard to complain and by this means defeat the enforcement of justice. There is an old rule of the common law, which is based upon reason, and which still lives, and that rule is that "the law punishes the slothful and rewards the vigilant." This is not only the law, but it is sound in morals, and is in harmony with the principles of the Bible, which commands that we should be diligent in business and fervent in spirit. In the case of *Byers v. Territory*, 1 Okla. Cr. 702, 103 Pac. 534, this court said:

"Justice demands that, in the administration of law, its processes should never be allowed to become a game of skill between contending counsel. There has been entirely too much of this in the past. It has resulted in the miscarriage of justice in many cases, and has bred a spirit of disgust for law and contempt for courts in the public mind."

If counsel did not know that the names of these additional witnesses had been indorsed on the back of the information before the trial began, why did he not say so in his motion and prove it by his affidavit? If he did know it, why did he remain silent until after the jury had been impaneled and sworn and jeopardy had attached? We cannot indorse such practices as this. It should be cendemned in any court. Such practices were condemned in the Byers case, *supra*, in the following language:

"The enforcement of the doctrine of harmless error in Oklahoma will greatly improve the character of our criminal trials. Lawyers will be compelled to try their cases upon their actual merits, and will cease devoting so much time in attempting to force technical errors into the record. The needless waste of much valuable time and the expenditure of a great deal of money will be saved, and far better results will be reached in the administration of justice, and courts will gain the confidence and respect of the people, and acts of mob violence will cease to disgrace our state."

But there is another reason why this conviction should not be reversed upon the objection now being considered. Section 6957, Comp. Laws 1909, is as follows:

"On an appeal the court must give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties."

If it were true that the court did err in not striking the names of these witnesses from the information and in permitting them to testify in this case, yet appellant has not shown or attempted to show how this error injured or deprived him of a single substantial right, and this he must do before we can, under our statute, reverse a case on account of any technical error or exception. If appellant was surprised at finding the names of these witnesses on the back of the information after the trial began, and did not know it when he announced ready for trial, he should have withdrawn his announcement of ready for trial, and filed a motion for a continuance under oath, and in this motion for a continuance he should have shown how he was surprised, and stated the specific injury which would be inflicted on him in the

event the trial proceeded without giving him an opportunity to meet the testimony of these witnesses.

This question was passed upon in the case of *Phillips v. State,* 35 Tex. Cr. R. 481, 34 S. W. 272. Phillips was charged with train robbery. During the trial a witness was permitted to testify of whose evidence the defendant had had no previous notice. Counsel for Phillips, who, by the way, is the writer of this opinion, immediately requested the court to be permitted to withdraw his announcement of ready for trial and to file a motion for a continuance, on the ground of surprise at the evidence of this witness. This was done, and the motion showing both surprise and injury, was sworn to, filed, and overruled by the court. Phillips was convicted, and upon appeal the cause was reversed, the court saying:

"Now, whether the court acted correctly in refusing to postpone the trial further it is not necessary for us to decide. Hodges' testimony was of the highest importance to the defendant. The evidence of Hardin had been left before the jury by the court as original criminative testimony. If Hardin told the truth, a deliberate confession was proven, with the particulars thereof. Concede that the court did not err in refusing to postpone the trial further, yet upon motion for a new trial, when the affidavit of Hodges was procured, there could be no doubt of its being the duty of the court to grant a new trial. Hodges, in his affidavit, traverses every fact sworn to by Hardin, that Hardin cursed and threatened him, saying that he would swear him into the penitentiary, and also shows that appellant called upon him to witness the fact that appellant would not converse with Hardin and that the prisoners regarded said Hardin as a detective."

No such motion was filed in this cause. No attempt is made to show that the testimony of the additional witnesses was false, or that appellant could have controverted the facts to which they testified, if he had had notice of their evidence. The doctrine announced in the Phillips case has been reaffirmed in Texas in the case of *Loveless v. State* (Tex. Cr. R.) 44 S. W. 508. Judge Hurt, certainly the greatest stickler for technicalities, and one of the greatest judges of criminal law who ever lived, said:

"Upon the trial, while the witness Lane was on the stand, he swore that he purchased the whisky about two months prior to the 20th day of September, to-wit, about the 1st of August. Appellant claimed a surprise, and asked the court to permit her to withdraw her announcement, and continue the cause to meet this proof, to-wit, that the whisky was sold on or about the 1st of August. This was denied, and appellant excepted. Under the indictment, the sale was charged to have occurred on the 29th of September; but proof could be introduced, showing that the sale took place on or about the 1st of August. The prosecution is never required, in cases of this character, to make proof that the offense took place on the day charged in the indictment. But it is insisted, as there were two indictments for this character of offense, both alleging the sale of intoxicating liquors to Lane, but on different dates, therefore the rule might be different. We do not understand that this would affect the principle at all; for if the accused is prepared to meet the charge as having been committed on a certain day, and has been misled so as to make preparations to meet that day alone, proof that the offense took place at a different time might be a surprise, and under certain circumstances would require the court to permit the party to withdraw his announcement and to continue the case, so as to meet the proof as it was made, to-wit, on the 1st of August. In order for the appellant to avail herself of this proposition, she must not only ask to withdraw her announcement and continue the cause, but, if this is refused, she must set forth the facts expected to be proved in the bill of exceptions, or it must appear in the record, properly authenticated, so that the court below and this court can see whether appellant had in fact any defensive matter to be urged. We have examined the record, and, finding no error requiring a reversal of the judgment, it is affirmed."

The same doctrine was also announced in the following cases: *Walker v. State,* 7 Tex. App. 245, 32 Am. Rep. 595; *Burton v. State,* 9 Tex. App. 605; *Cunningham v. State,* 20 Tex. App. 162; *Withers v. State,* 23 Tex. App. 396, 5 S. W. 121; *McCoy v. State,* 27 Tex. App. 415, 11 S. W. 454.

We therefore hold that, although the court may err in permitting a witness to testify in the trial of a case, this error alone will not be ground for reversal, because our statute in express terms prohibits us from setting aside a judgment upon any exception which did not affect the substantial rights of the defendant. Where a witness is permitted to testify improperly, it is the duty

of the defendant, not only to object and except to such testimony, but to further reserve his rights by withdrawing his announcement of ready for trial and filing a motion under oath, in which the facts are stated which show that the testimony of such witness injuriously affected the substantial rights of the defendant. This is the rule in the Court of Criminal Appeals of Texas, than which a more technical appellate court does not exist in the United States. We think it is absolutely fair and just both to the defendant and to the state, and we adopt it as the rule in Oklahoma.

While it is true that lawyers should do everything in their power that is fair and legal to protect the substantial rights of their clients, and in so doing they sould be upheld by the courts, yet it is a very low idea of the profession of law to think that courts are established merely for the purpose of encouraging and making money for lawyers. Courts are established for the entire people, and should not be conducted in the interests of lawyers, or of any class, to the injury of the entire people. The sole purpose of a trial court should be the discovery of the truth and the enforcement of justice, and all other considerations are and should be secondary to these. Therefore courts should not adopt or enforce any rule of practice which fails to include all classes, and which discriminates against the people in favor of any class. If it is not the sole business of the courts to enforce justice and thereby protect society, then they have no rightful mission on earth. The profession of law is necessary for the assistance of the people and the courts in presentation of cases to the courts and in advising clients. When properly followed, it is a useful and an honorable profession. To make it occupy this position should be and is the ambition of every true lawyer. But unfortunately the law, as well as all other occupations, has unworthy members, who would prostitute it from its high mission, and who endeavor to use it as a means of defeating justice and securing the acomplishment of their own selfish purposes. It is natural, and therefore to be expected, that those lawyers who only value their profession as a means of enriching themselves, and who think it is the duty of courts to so rule as to encourage

litigation and keep cases in courts, and have them tried and retried as long as possible, in order that lawyers may grow fat while their clients grow lean, will criticise this court for its policy. The gospel of justice is deadly poison to such characters, who, it matters not how able they may be, are in fact unworthy members of their profession and a standing menace to the communities in which they reside. Their capital consists chiefly of their knowledge of obsolete technical rules. Therefore they desire this court to enforce these rules, and thereby perpetuate the chains which have bound justice hand and foot for so long a time.

The doctors have a good reason for not writing their prescriptions in English. Many of the ills of which people complain are purely imaginary. Such people will not be satisfied unless they believe that they are taking medicine. If they knew the simple and harmless character of what conscientious doctors prescribe for them, they would resent it, and would employ ignorant quacks, who would prescribe strong medicine to their great injury. To protect themselves and the public health, the doctors are justified in keeping their patients in the dark as to what remedies they prescribe. Not so with the profession of law. Obsolete technicalities, which the people cannot understand, have no more place in the law than dog Latin and Egyptian hieroglyphics would have, and it is the duty of the courts to cut them out. The lawyers who resist this are the real quacks of the profession. The criticisms which have been heaped upon this court by this class of lawyers, because it is doing all in its power to substitute substance for shadows and justice for technicalities in the practice of law in Oklahoma, remind us of an incident which occurred in an ancient city nearly 2,000 years ago, and which is recorded in the 19th chapter of the Acts of the Apostles, as follows:

"23. And the same time there arose no small stir about that way.

"24. For a certain man named Demetrius, a silversmith, which made silver shrines for Diana, brought no small gain unto the craftsmen.

"25.   Whom he called together with the workmen of like occupation, and said, Sirs, ye know that by this craft we have our wealth.

"26.   Moreover ye see and hear, that not alone at Ephesus, but almost throughout all Asia, this Paul hath persuaded and turned away much people, saying that they be no gods, which are made with hands:

"27.   So that not only this our craft is in danger to be set at naught, but also that the temple of the great goddess Diana should be despised, and her magnificence should be destroyed, whom all Asia and the world worshippeth.

"28.   And when they heard these sayings, they were full of wrath, and cried out, saying, Great is Diana of the Ephesians."

We can only say to such misguided lawyers that their efforts will be as powerless to change our course as were the efforts of Demetrius to intimidate the great Apostle to the Gentiles.   Regardless of consequences, we are going to construe the laws of Oklahoma according to their spirit and in the interest of the entire people.   We are glad to know that the most reputable lawyers in Oklahoma approve and indorse this course.   The sooner all of the lawyers in Oklahoma recognize that it is by this standard that we determine all questions submitted to us the sooner they will quit making purely technical defenses, and will address themselves entirely to the merits of the cases before us.   When they do this they will have no occasion to complain at a want of respectful and earnest attention and consideration.   As long as they continue to insist upon trying their cases on the basis of technicalities, without reference to merit or justice, this court will be forced to continue to condemn such practices, and the longer this practice is continued the stronger our condemnation will become, it matters not who the lawyers may be.   In fact, this is not practicing law; it is practicing quibbling, and courts are to be blamed for permitting it to be done.   It lowers the standard of the profession, and brings courts into disrepute with intelligent and justice-loving people.   We dislike to criticise any one, or to say unpleasant things; but we announced in an early case that we would require the lawyers of Oklahoma to try their cases upon their merits, and we are going to enforce this rule as nearly as possible, as unpleasant as it may become to ourselves and

others. We have time and again given notice of our purpose; so, if any lawyer gets his feelings hurt, he has no one except himself to blame for it, because we are in earnest about this matter, and will have no pets or favorites in enforcing this rule.

For the reasons above given, we hold that the court did not err in refusing to strike the names of the witnesses complained of from the back of the information, and in overruling the objections offered to the testimony of each witness when placed upon the stand.

Third. It was proven upon the trial that the building occupied and kept by appellant during the month of February, 1911, had the general reputation in the city of Enid of being a place at which intoxicating liquors were sold, and that it was a place where persons who were in the habit of drinking intoxicating liquors congregated during the week and on Sundays. To the introduction of this testimony counsel for appellant strenuously objected, and saved an exception. The question therefore presented is whether or not this evidence was legal and competent in cases of this kind. Counsel for appellant insists in his brief that the reputation of the place kept by appellant was not the proper method of proving the issues in this case; but he fails to cite a single authority or make any argument in support of this proposition, but contents himself with assuming the proposition in controversy and substituting assertion for argument and authorities. This question has been repeatedly passed upon by this court contrary to the contention of counsel. In the case of *Johnson v. State*, 6 Okla. Cr. 491, 119 Pac. 1019, it is expressly held that it is competent for the state to prove in cases of this sort that the defendent kept intoxicating liquors at some place to which people generally resorted, and that such place had the general reputation in that community of being a place at which intoxicating liquors could be illegally obtained. The same doctrine was announced by this court in the case of *Titsworth v. State*, 2 Okla. Cr. 282, 101 Pac. 293. This court there said:

"In cases against defendants for keeping intoxicating liquors for sale, the general reputation of such places in the community

in which they are situated touching this point is admissible in evidence, just as it is permissible to prove the general reputation of a bawdy house, a gambling house, or of any place which constitutes a nuisance. Section 14, art. 3, of the Enforcement Act (page 608, Session Laws 1907-08, expressly makes places where liquors of any kind are sold, manufactured, bartered, given away, or otherwise disposed of in violation of law, nuisances."

In the case of *Carroll v. State,* 4 Okla. Cr. 246, 111 Pac. 1022, the reasons supporting this rule are thus announced:

"The general reputation of a house in the neighborhood is the result of the conduct of the person who keeps it, and there is no injustice in holding such person responsible for this reputation. In fact, in cases of this kind, the reputation of the house is its advertisement, and is a source of profit to its keeper. We fully agree with Mr. Wigmore when, in speaking of this class of cases, he says: 'Having regard to the circumstances from which such a reputation arises, and the difficulty of obtaining other evidence in the ordinary way from unimpeachable witnesses, it seems unquestionable that reputation should be admitted as trustworthy and necessary evidence.' Volume 2, page 1621, Wigmore on Evidence."

With these decisions published in our Reports, we are surprised that any lawyers in Oklahoma should make the objection now presented, and that the prosecuting officers of Oklahoma do not use this class of evidence in all such cases. If this were done, it would be an easy, inexpensive, and expeditious matter to close every known bootlegging joint in Oklahoma. We can only understand their failure in this respect upon the ground that they have not taken the trouble to inform themselves as to what this court has decided, or that they do not wish to enforce the law. It is high time that this kind of conduct upon the part of those whose duty it is to enforce the law should be stopped. A law-abiding people will not always submit to it. Some summary means of removing such officers should be provided by the Legislature.

Counsel in his brief insists that this evidence should not have been admitted, upon the further ground that the testimony shows that, on account of the conduct of a previous tenant, the house occupied by appellant had the general reputation of being a boot-legging joint at the time appellant moved into it. There is

no proof that he was compelled to occupy this house against his will, or that he did not know its previous reputation when he moved into it. If appellant did not take any action to counteract the previous reputation of the building after he occupied it, but, on the contrary, availed himself of the previous reputation of the building as a means of advertising his business and securing customers, this would be a strong circumstance against him, which the jury were authorized to consider. The court did not err in admitting the evidence complained of.

Fourth. Counsel for appellant contends that the verdict of the jury is contrary to and not sustained by the law and the evidence. In the trial court the jury are the exclusive judges of the facts proven, the weight of the evidence, and the credibility of the witnesses, and we have neither the right nor power, in reviewing their verdict, to set it aside upon the ground that it is contrary to the evidence, where there is any evidence in the record from which the jury could legitimately draw the conclusion of the defendant's guilt, unless it appeared from the record that the jury were influenced by improper motives in arriving at their verdict. In the case of *Bigfeather v. State,* 7 Okla. Cr. 364, 123 Pac. 1026, this court said:

"A new trial on the ground that the verdict of the jury is contrary to the evidence will not be granted merely because the court may be of opinion that the weight of the evidence is against the verdict; but the court must find that there is no evidence from which the jury could rationally conclude that the appellant was guilty, unless it appears from the record that the jury were influenced by improper motives in arriving at their verdict."

See, also, *Summers v. State,* 7 Okla. Cr. 10, 120 Pac. 1031; *Nowlin v. State,* 7 Okla. Cr. 27, 115 Pac. 625; *Overton v. State,* 7 Okla. Cr. 204, 123 Pac. 175; *Lawyer v. State,* 7 Okla. Cr. 361, 123 Pac. 850; *Deaton v. State,* 7 Okla. Cr. 436, 123 Pac. 701; *Welsh v. State,* 7. Okla. Cr. 358, 123 Pac. 705; *Stanfield v. State,* 7 Okla. Cr. 397, 123 Pac. 1033; *Tucker v. State,* 7 Okla. Cr. 634, 125 Pac. 1089; *Rupard v. State,* 7 Okla. Cr. 201, 122 Pac. 1108; *Sims v. State,* 7 Okla. Cr. 7, 120 Pac. 1032; *Ritchie v. State,* 7 Okla. Cr. 188, 122 Pac. 944; *Motley v. State,* 7·Okla. Cr. 198, 122 Pac. 1110; *Brisco v. State,* 7 Okla. Cr. 517, 124

Pac. 626; *Brown v. State,* 7 Okla. Cr. 678, 126 Pac. 263. An equal number if not more cases to the same effect might be cited from each volume of our Reports, because this is the uniform and invariable rule of this court on this question.

We must therefore now examine the record, and see if it contains any evidence which sustains this verdict. It will therefore only be necessary to state that portion of the testimony which tends to sustain the verdict, unless we should discover in the record evidence that the jury were influenced by improper motives in arriving at their verdict.

E. H. Walters was the first witness for the state. He testified that he was a deputy sheriff of Garfield county, Okla., and that he was acquainted with appellant, and that he knew the place kept by appellant in the city of Enid during February, 1911; that by virtue of a search warrant he searched appellant's place of business on the 17th day of February, 1911; that the first room which he entered contained a pool table and cigar stand; that from this room he entered a second room; that the windows to the second room were painted, so that it was impossible to see through them from the street; that in this room he found a water cooler, whisky glasses, and beer bottles, and a washtub with ice and beer bottles in it, and a suit case with beer bottles in it lying on the floor; that he also found two pints of whisky and a part of a pint of whisky sitting on a shelf; that appellant occupied all of the lower floor of the building; that this was in Garfield county, Okla.; that appellant was not present when the search was made, but that he had seen appellant in the place on previous occasions; and that since this raid was made appellant admitted to him that he was running the place at the time the raid was made.

Grimes Groat testified, for the state, that he was also a deputy sheriff and assisted in the search of the premises of appellant; that the place of business of appellant was on North Independence street, in the city of Enid; that on this occasion he found 2 pint bottles of whisky full, and 1 pint bottle nearly full, and 17 pint bottles of beer; that in the same room they found whisky glasses and beer mugs; that part of the beer was

on ice in a tub, and part was in a suit case; that there were no other furnishings in the room except this; that the windows were either soaped or painted, so that a person from the street could not see on the inside.

C. L. McClain testified that he had frequently passed the building on North Independence street, in the city of Enid, which was occupied by appellant; the front room was used as a pool hall; in the rear of the pool hall there was a small room; that he examined these premises since the appellant moved out of the building; that the windows of the second room in the rear of the pool hall, where the building was occupied by appellant, were so painted or frosted that a person could not see through them from the street; that this place of business had been raided by the sheriff's office two or three times prior to the 17th day of February, 1911.

J. A. Kamrath testified, for the state, that he knew the place of business of appellant; that he had frequently seen the appellant there in charge of the business; that during the month of February the place of business of appellant had the general reputation in the city of Enid of being a place where intoxicating liquors were unlawfully sold; and that it was a place where the drinking element congregated during the week and on Sundays.

Glen Walters testified that he had visited appellant's place of business and seen appellant there; that he had no particular business there, more than any person would have who would go into a place to play a game of pool. The answers of this witness were exceedingly elusive, as to whether or not he had ever entered the small room in the rear of the pool hall, and as to what, if anything, he had purchased there. The most he could be induced to say was that he had gotten what he supposed to be beer in there.

The state next introduced in evidence a certified copy of the record of the United States internal revenue officer for the district of Oklahoma, showing that on the 17th day of February, 1911, appellant had obtained a license to pursue the business of retail liquor dealer at No. 205 N. Independence street, Enid, Oklahoma. The state then rested.

Appellant offered no testimony, except the evidence of the register of deeds of Garfield county, by which he attacked the description given in the information as to the block and number of the lot upon which appellant's place of business was situated. There is absolutely nothing in the record which in the least degree indicates that the jury were influenced by improper motives in arriving at their verdict. It is true that there is no direct evidence of the sale of any intoxicating liquors in the place of business kept by appellant; but this is not necessary in cases of this sort. All of the circumstances of the case overwhelmingly and conclusively prove the purpose for which appellant had in his possession the intoxicating liquors which were found in his place of business. That is all that the law requires in such cases as this. We do not believe that a sane and honest jury could be found in this state who, having a due regard for the circumstances in evidence and their oaths, could come to any other conclusion but that appellant was guilty as charged.

In the case of *Luttrel v. State,* 7 Okla. Cr. 2, 120 Pac. 1021, on this very question this court said:

"It was proven upon the trial that the appellant was engaged in keeping a confectionery in the town of Hugo. His premises were searched by the sheriff, and whisky was found in his possession. One bottle was found in his overcoat pocket, and two other bottles were found concealed about the place, and one witness testified to having purchased whisky from appellant something like 60 days before the time when the whisky was so found in his possession. This evidence was admitted to show the purpose for which appellant had the whisky in his possession. Appellant testified that the whisky which was found in his place was kept there for his own use. This issue was fully submitted to the jury. The testimony is sufficient to sustain the verdict."

In the case of *Rial v. State,* 7 Okla. Cr. 110, 122 Pac. 588, this court said:

"In this case the undisputed evidence is that appellant, Paul Rial, conducted what was known as the Bank drug store in the city of Muskogee; that this drug store was searched for intoxicating liquors in December, 1910; that there was a room about 16 by 18 feet in the back of the drug store, and in this room was found a quantity of whisky and beer on ice; and that there was also in this room an ice box, glasses for drinking intoxicating liquors, and a cork puller. There was a barrel behind the counter,

in which empty bottles were placed. There was a counter in the room, with a shelf behind the counter. There was a bottle of whisky and one of wine sitting on this shelf, and the corks set in them loosely. There was a vault that cut into the room between the prescription case and the north side of the room. In this vault nails were found in planks placed in there loosely, so they could be pulled out with the fingers, and, when they were pulled out, the planks would slide out. In this vault about 30 bottles of wine were found; also a five-gallon water bottle, containing about a gallon of whisky; and also a tow sack full of beer bottles, and another tow sack half full of beer. The above is a condensed statement of the testimony on the part of the state. The appellant offered no evidence in reply. This evidence conclusively shows that the appellant and all persons concerned with him in conducting this establishment were violating the law, and all such persons should have been prosecuted and convicted for their participation in this offense."

In the case of *Terry v. State,* 7 Okla. Cr. 430, 122 Pac. 599, this court said:

"It was proven upon the trial of this cause that on the 14th day of February, 1911, the premises occupied by appellants were searched for intoxicating liquors by the officers of Blaine county; that appellants claimed to be in the poultry business, and occupied a two-room house in the town of Watonga; that one of these rooms was occupied as a living room, and the other as a place of business; that a barrel, containing 37 bottles of whisky, was found in this house, in the room used as a living room, and also a bottle of whisky was found in said room; that an empty barrel was found in this house, similar to the one which contained the whisky. It was also proven that on the 30th day of January, 1911, appellant Brown received, at the depot in Watonga, a drum or barrel of whisky weighing 100 pounds, and that appellant Terry was present and identified appellant Brown as the owner of the whisky when it was received at the depot. It was also proven that on the 13th day of February following, appellant Huff received a drum or barrel of whisky at the railroad depot in the town of Watonga, containing 50 bottles of whisky. This was the day before the whisky was found in the premises of appellants. A number of witnesses testified that they had visited the place of business of appellants early in February and had obtained whisky there, although it is not clear as to whether or not they paid for the whisky. This, however, was immaterial. The sheriff testified that after the whisky was found in the possession of appellants, and they were arrested, appellant Terry claimed the

whisky belonged to him, and stated that he had it for his own use. None of the appellants lived in Watonga before January 1911 * * * We are therefore of the opinion that the evidence not only supports the verdict of the jury, but that it clearly establishes the fact that appellants are all guilty. The judgment of the lower court is therefore, in all things, affirmed."

In the case of *Hadley v. State,* 7 Okla. Cr. 122, 122 Pac. 728, this court said:

"Appellant insists that the testimony does not support the verdict. We have carefully examined the record, and we do not see how the testimony of the state can be true, and the appellant can possibly be not guilty. It was proven: That appellant was conducting a so-called drug store in the city of Muskogee. That on the 17th day of December, 1910, his place of business was searched for intoxicating liquors by the officers of Muskogee county. That the officers went back behind the prescription case, and there they found a box five feet long and four feet wide sitting on the floor. That they moved this box and found a hole cut in the floor. That they raised up the lid over this hole, and there found concealed 12 quarts of whisky. They also found one or two barrels of empty beer bottles in this room. There was a bar on the south side of the room. Appellant was present when the officers removed the box, and found the hole in the floor, and discovered the whisky. That when the officers found the whisky appellant laughed, and said he had worked almost all night the night before to make this place. It is inconceivable that appellant should have gone to this trouble to conceal the whisky, if he was keeping it in his drug store for a lawful purpose. It is also proven that a few days prior to the 17th day of December the place of business of appellant had been searched for intoxicating liquors by the officers, and they found there a quantity of whisky, beer, and wine; that they found the whisky under the floor by the prescription case. The state also introduced a certificate of a United States license issued to appellant and one Tom Hadley to engage in the business of retail liquor dealers in Muskogee, dated July, 1910, on which the sum of $26 tax was paid. This certificate was duly signed by the internal revenue collector for the district of Kansas. We are at a loss to see how a stronger case could be made out. Appellant took the witness stand in his own behalf, and testified that he was a legally registered pharmacist, and had been since statehood, but did not in any manner deny one word of the testimony offered by the state. We think that the evidence conclusively establishes the guilt of the appellant."

In the case of *Heatley v. State,* 7 Okla. Cr. 377, 123 Pac. 850, this court said:

"The proof in this case was to some extent conflicting; but the credibility of the witnesses was exclusively for the trial court. The sheriff of Jackson county testified that on the 31st day of May, 1911, about 9 o'clock at night, he searched a rooming house, known as the Blue Goose, in Altus, Jackson county, Okla., and he found there some 18 or 20 bottles of whisky; that he found some of this whisky in a back room downstairs; that in the room where the whisky was found there was also found a number of empty bottles lying around, and a barrel of empty bottles, and these empty bottles were whisky bottles and beer bottles; that upon going upstairs, and making a further search, he found a trapdoor under the carpet; that the carpet had to be rolled back to get to the trapdoor. This witness testified positively that appellant, Vergo Heatley, and a young man named Dean, were operating the Blue Goose rooming house at this time; that while he was leaving the place he met Heatley, and asked him who was running the Blue Goose, and appellant replied he was running the place; that appellant was then informed that whisky had been found there, and appellant then changed his statement, and said that he had not yet taken charge of the place. This testimony tended to prove that the room where the barrel of empty bottles was found was used as the place where sales were made, and under the secret trapdoor upstairs was the place where the supply was concealed. If appellant had this whisky in his possession lawfully, why the necessity for this concealment? The fact that he professed to be operating the Blue Goose rooming house until he was informed that whisky had been found. there, and that he then attempted to deny it, is also strongly indicative of his guilt."

We might fill a volume, quoting from other decisions of this court, to the same effect, for we have affirmed hundreds of just such cases as this, where there was no direct proof of the sale of intoxicating liquors, and where the circumstances all clearly established the fact that the appellant maintained a place for the purpose of selling intoxicating liquors in violation of law. We therefore hold that the evidence in this case fully sustains the verdict.

Fifth. Counsel for appellant complains that the trial court erred in permitting leading questions to be asked the witnesses for the state, and also erred in remarks made with reference to such witnesses. There are two well-settled rules of law; one is that

attorneys should never ask leading questions of their own witness with reference to material matters. The other is that the trial court should carefully abstain from expressing any opinion as to the truthfulness of a witness, and should not make any remarks in any manner reflecting upon the testimony of a witness. But these rules, like all others, have exceptions. Where a witness proves to be hostile toward the party placing him upon the stand, and evades answering general questions, leading questions may be asked; otherwise, it would often be impossible to develop the truth, and where a witness attempts to avoid answering such questions, it is not only the privilege, but it is also the duty, of the trial court to reprimand such witness and punish him for contempt of court. In the matter complained of in this case the witness was evidently friendly to appellant and hostile to the state, and did everything in his power to shield and protect the appellant, and never did give a positive answer to questions asked him, where such answer might incriminate the appellant. The trial court would have been entirely justifiable in committing this witness to jail for contempt of court. In fact, the witness may be guilty of perjury in his suppression of the truth. When a person is placed in a position where it is his duty to tell the entire truth, and he willfully suppresses part of it, this is just as criminal in morals and in law as an affirmative statement of a falsehood. It was for this crime that Ananias and Sapphira died. Their crime consisted in not telling all of the truth when they should have done so. This incident is recorded in the Bible in the fifth chapter of Acts, as follows:

"But a certain man named Ananias, with Sapphira his wife, sold a possession.

"2. And kept back part of the price, his wife also being privy to it, and brought a certain part, and laid it at the apostles' feet.

"3. But Peter said, Ananias, why hath Satan filled thine heart to lie to the Holy Ghost, and to keep back part of the price of the land?

"4. While it remained, was it not thine own? and after it was sold, was it not in thine own power? Why hast thou conceived this thing in thine heart? Thou hast not lied unto men, but unto God.

"5. And Ananias hearing these words fell down, and gave up the ghost; and great fear came on all them that heard these things.

"6. And the young men arose, wound him up, and carried him out, and buried him.

"7. And it was about the space of three hours after, when his wife, not knowing what was done, came in.

"8. And Peter answered unto her, Tell me whether ye sold the land for so much? And she said, Yea, for so much.

"9. Then Peter said unto her, How is it that ye have agreed together to tempt the Spirit of the Lord? Behold, the feet of them which have buried thy husband are at the door, and shall carry thee out.

"10. Then fell she down straightway at his feet, and yielded up the ghost; and the young men came in, and found her dead, and, carrying her forth, buried her by her husband.

"11. And great fear came upon all the church, and upon as many as heard these things."

We have no sympathy with a man who will commit any kind of perjury under any circumstances, and certainly will not exert our power to protect him. The smaller the case in which it is committed, the more serious the crime. From records filed in this court we find that this crime is common in Oklahoma to-day, and it must be checked before justice in its purity can be enforced. We earnestly request all county attorneys of Oklahoma to vigorously prosecute all such offenders. We may not be able to make them love the truth, but if vigorously prosecuted for perjury they will at least be taught to fear the courts and the law.

On account of the importance of this question, we will repeat what we said in the case of *Coleman v. State,* 6. Okla. Cr. 285, 118 Pac. 607:

"Next to the crimes of seduction and rape, perjury is the most serious offense against the laws of the state, and the most infamous in its character that can be committed, and especially the kind of perjury for the commission of which appellant now stands convicted. We can have some respect for a man, who for a real or fancied wrong enters into a fair combat in which he takes the life of his adversary. We can even sympathize with an aged, widowed mother, or a devoted wife, sister, or daughter, who, through love for a son, a husband, or brother, or a father, is driven to the commission of perjury to save such loved one

from the hangman's noose. We can understand how perjury in cases of this kind may not indicate an utter want of moral character; but we cannot find language strong enough to express our detestation of the crime of which the appellant has been convicted. The smallness of the case for which perjury is committed is a true indication of the moral depravity of the man who commits it. The fact that the jury did not give appellant the full limit of the law is the only thing about this case worthy of criticism. We think that, the smaller the inducement for perjury, the greater the punishment should be. The man who will commit perjury to shield a crap shooter or a bootlegger is a most dangerous man to society. The longer he can be locked up, the better it will be for the interests of public justice. From the records which we have examined in boot-legging and gambling cases, we are impressed with the idea that this kind of offence is common in this state. In fact, it appears that these cases are largely schools for perjury. The county attorneys and judges and grand and petit juries of the state cannot be too diligent in bringing such parties to justice. There is too much of a disposition to look upon perjury in these cases as something to be expected, and as being of but small importance. Men who perjure themselves in these small cases will not hesitate, if an inducement is offered, to perjure themselves in order that they may cheat the gallows of its due, or consign innocence to a felon's cell, or rob the widows and orphans of their property. Perjury attacks the integrity of all legal proceedings, and thereby endangers the institutions of our country; and we again call on county attorneys and all other officers to exercise the utmost diligence in prosecuting these offenders, with the assurance that, when they are fairly tried and proven to be guilty, this court will not hesitate to do its full duty in each case. No class of offenders should be more vigorously and relentlessly prosecuted or severely punished. County attorneys are requested to urge these views upon juries in all perjury prosecutions. Let all unite in a determined effort to make perjury dangerous, even in the smallest case. When this is done, there will be more respect for law, and not so many miscarriages of justice in our courts."

The only mistake committed by the trial court with reference to this matter was in not committing this witness to jail for contempt of court, and ordering the county attorney to proceed against him for perjury. We are glad that counsel for appellant has brought this matter to our attention, so that we may emphasize our views with reference to it. The county attorneys

and judges of Oklahoma can depend upon the earnest support of this court in attempting to stamp out the crime of perjury among us.

Sixth. Counsel for appellant complains of remarks made by the assistant county attorney in his closing speech to the jury. The record on this subject is as follows:

"Thereupon County Attorney Charles N. Harmon makes his argument to the jury for the state, and F. E. Chappell, attorney for the defendant, makes his argument to the jury. Thereupon Assistant County Attorney R. J. Balch makes the rebuttal for the state, and in the course of his argument says: 'When they found that men were swarming in there to wet their whistles.' To which the defendant objects, and the court overrules the objection, noting the exception of the defendant."

The objections urged to the remarks made were that no one testified as to why people visited the place of business of appellant, and that there was no evidence upon which the inference should be based that they went there to get intoxicating liquors. If they did not go there to illegally obtain intoxicating liquors, why were the windows in this room painted so that persons from the street could not see what was going on in this room? Why was it that whisky and beer bottles were found in this room? Why were ice and beer bottles placed in a tub? Why had appellant taken out an internal revenue license to pursue this business at this place? Why was it that there was no other furnishing in this room? The argument of counsel for appellant reminds us of the argument made in a case where the lawyer said:

"It is true, gentlemen of the jury, that the witnesses testified that they saw the defendant place his gun to his shoulder and point it at the dog, that they heard the report of the gun and saw the flash, that they saw the dog fall and heard him yelp, and that upon going to the dog they found him dead, with a hole through him; but no witness swore that he saw the bullet come from the gun and make that hole through that dog."

Notwithstanding this able and eloquent argument, the defendant was duly convicted of shooting the dog. The dog argument is just as good as that now made. The remarks of the assistant county attorney were entirely justifiable by the record.

Seventh. In his brief counsel for appellant complains at great length of alleged error committed by the trial court in the instructions to the jury, and the refusal of the court to give special instructions requested. Instructions given or refused must always be considered in connection with the evidence in the case. The instructions given in this case are not above criticism, and if this were a close case, in which the jury might have rendered a verdict either for the state or the defendant, we would earnestly consider giving appellant a new trial on account of the instructions. But we find no fundamental error in these instructions, and considering them in the light of the evidence, there is nothing in the instructions which could have caused the jury to render a different verdict. Even if the court was wrong in the instructions given, yet it is clear that the jury were right in the conclusions at which they have arrived, both as a matter of fact and as a matter of law. This court does not reverse convictions under such circumstances as these.

In the case of *Steils v. State,* hereinbefore quoted, which was also a case in which the appellant was charged with maintaining a place where intoxicating liquors were sold, and which, like this case, depended alone upon circumstantial evidence, this court said:

"In this case counsel for appellant rely upon a purely technical defense, and manifested great zeal and ability in the presentation of the questions relied upon. It is unfortunate for counsel that the days of a purely technical defense, unless based upon a substantial right, have passed and gone, never to return in this state. But counsel did not show wherein his client had been deprived of a single substantial right in the trial of this cause, and the testimony overwhelmingly proved that the appellant was guilty. There is another matter which courts should seriously consider. The honest, hard-working, tax-burdened people of Oklahoma annually spend more money to enforce their laws than they do to educate their children. In our judgment, they are entitled to consideration; and it is an outrage on law and justice and a crime against society for appellate courts to turn criminals loose who have been legally proven guilty, or to send their cases back, to be retried at the expense of the people, upon legal quibbles which are without substantial justice, and which are only shadows,

cobwebs and flyspecks on the law. It is such so-called judicial decisions as these, in civil as well as in criminal cases, that are responsible for the growing demand among the people for the recall of judges. When we have read some of these opinions ( ?) we are impressed with the thought that if the courts do not exercise more care in the future, and see that they are courts of justice, as well as courts of law, the people, who are the rightful source of all power, will take the matter into their own strong hands; and there is no telling what the result will be. If we ever have the recall of judges in Oklahoma, it will be the fault of the judges themselves."

We find no substantial error in the record in this case, and we are of the opinion that, in the conviction of appellant, justice has simply overtaken, claimed, and marked her own.

What is said in this opinion represents the settled policy of this court. It would fill an entire volume to quote from all of our opinions on this subject. We know that the wisest, most careful, and best men sometimes make mistakes. It is therefore possible that in the rush of business, because we are worked to the limit of human endurance, we may have made some mistakes. It would be strange, indeed, if we have not done so. But if this court has ever rendered any opinion in conflict with what is herein stated, then such opinion is now expressly overruled and repudiated, and the trial courts and prosecuting attorneys of this state will so treat it, and will be guided by this opinion alone. We are determined to do all in our power to aid in the enforcement of all of the laws of Oklahoma, whether we like some of these laws or not, and regardless of who may take offense at our action. In fact, we cannot discharge our duty without giving great offense to those who are disposed to violate the law, and to all who oppose the enforcement of the law.

Nothing said in this opinion is intended to reflect upon the ability, integrity, or professional standing of counsel who represented appellant in this cause. On the contrary, it affords us great pleasure to be able to testify to his high professional standing. What is said with reference to the conduct of lawyers, the doctrines of harmless error and disregard of technicalities, and of circumstantial evidence, must be considered as purely impersonal,

so far as counsel is concerned. We have gone fully into a discussion of these questions, because the accusation has been circulated all over the state that this court refuses to apply the doctrine of harmless error and disregard of technicalities to whisky cases, and that we do not permit convictions in such cases to stand upon circumstantial evidence. It is for this reason that we have gone so fully into the questions involved in this case, and have quoted from our previous decisions, so that no one might be misled by the misstatements of facts which have been made with reference to our position, and no prosecuting attorney can take these misstatements as an excuse for neglect of duty on his part. We have not in any manner changed our attitude upon these questions, but have only restated what we have often before decided, so that there could be no excuse for the continuance of the groundless accusations above referred to.

The judgment of the lower court is affirmed.

ARMSTRONG and DOYLE, JJ., concur.