# ED RYAN v. STATE.

No. A-928.    Opinion Filed February 8, 1913.

(129 Pac. 685.)

1.    **APPEAL—Briefs—Citation of Authorities.** Where decisions of the Supreme Court of Oklahoma or of this court are relied upon, the brief should cite the page and volume of the state reports upon which such decisions can be found.

2.    **APPEAL—Record—Arraignment.** The failure of the record to show arraignment and plea does not constitute a fatal defect, where the record shows that the defendant, without objection, announced ready, and that the case was fairly tried.

3.    **HOMICIDE — Evidence — ''Dying Declarations'' — Preliminary Proof.** (a) Where the proof shows that the deceased was shot in the stomach between 5 and 6 o'clock p. m., and died that night, and that immediately after being shot he fell down and was unable to get up again, and that he stated to persons who saw him soon after he was shot that he was a dead man and could not live, that he was going to die, such proof sufficiently shows that the deceased apprehended the certainty and imminence of his impending death, and is in itself a sufficient predicate for the admission of his statements of the circumstances of the homicide as ''dying declarations.''

      (b) Where a person mortally wounded and without hope of recovery, under a solemn conviction of impending death, makes several statements at different times of material facts concerning the circumstances of the homicide, all of said statements are admissible in evidence.

Statement of Facts.

4.    **SAME—Manslaughter—Duty to Charge.** (a) It is always the duty of the trial court to instruct on the law of manslaughter if there is any reasonable evidence that the alleged crime might have been done under circumstances that would reduce the crime from murder to manslaughter.

(b)  This court will not reverse a conviction for manslaughter, where this issue has been submitted to the jury by the trial court, upon the ground that, in its judgment, the defendant should have been convicted of murder.

5.    **TRIAL—Requested Charge—Applicability to Evidence.** It is not error for the trial court to refuse to submit a special instruction, although it may be a correct statement of the law, where such instruction is not applicable to the evidence, or where the law governing the question presented has already been correctly stated to the jury in the general instructions.

6.    **APPEAL—Review—Instructions—Exceptions.** In the absence of exceptions to instructions given, they will only be examined for fundamental errors.

7.    **NEW TRIAL—Newly Discovered Evidence—Application—Requisites.** A motion for a new trial upon the ground of newly discovered evidence is fatally defective, where it does not state fully the circumstances which make it appear that such evidence, as a matter of fact, was newly discovered and could not have been discovered earlier by the exercise of proper diligence.

8.    **APPEAL—"Injury."** The term "injury," used to describe an error for which a reversal may be had, means an error which affected the result.

(Syllabus by the Court.)

### Appeal from District Court, Coal County; A. T. West, Judge.

Ed Ryan was convicted of manslaughter in the first degree, and his punishment was assessed at confinement in the penitentiary for eight years, and he appeals. Affirmed.

Appellant, Ed Ryan, and the deceased, George Smith, were neighbors engaged in the occupation of mining, and lived in the vicinity of Coalgate, in Coal county, Okla. This homicide was alleged to have been committed on or about the 2d day of January, 1910; and it appears from the record that prior to the commission thereof the appellant and the deceased had had some trouble, and there existed, perhaps on the part of both of them, certain ill will and bad feeling toward the other. This had manifested itself on various occasions, as testified to by witnesses;

some witnesses for the defendant testifiing as to alleged threats which amounted to nothing more than the application of epithets by the deceased towards the defendant, by which he called him vile names, etc. On the day of the killing, which was Sunday, it appears that both the deceased and the defendant had been to the town of Coalgate, and had been drinking some. The defendant went home an hour or so earlier than the deceased, and says that during that time he was engaged in carrying water to his house from the well of a neighbor by the name of Committie. The Committie well was located northwest of the defendant's house about 300 yards, and in going to this well it was necessary for the defendant to cross the highway that led from the town of Coalgate to the deceased's house; the evidence showing that the deceased lived about a quarter of a mile further north on this road than the defendant. The killing occurred in this public highway, and there were no witnesses to the transaction except the defendant and the deceased.

The first people upon the scene testified that the deceased was lying on the ground from five to ten steps north and east of the gap in the fence surrounding the Committie land, and on the path towards the well, and that the defendant was standing in the public highway some eight or ten steps south of the deceased. The witnesses for the defendant testified that there was a knife in the road a foot and a half or two feet from the right hand of the deceased, and that this knife was open. Some of the witnesses for the state testified that when they got up to where the deceased was, the deceased told them that Mrs. Ryan, the wife of the defendant, had taken his knife out of his pocket. The testimony in this case is conflicting. The deceased said that the defendant waylaid him and shot him down while he was unarmed and was making no attempt to attack him. The defendant claims that he shot him in his necessary self-defense from an attack then being made upon him by the deceased with an open knife.

*George Trice,* for appellant.

*Smith C. Matson,* Asst. Atty. Gen., for the State.

FURMAN, J. (after stating the facts as above). First. Counsel for appellant has filed a lengthy brief in this cause, in which he has cited a number of the decisions of this court, but has not cited the volume and page upon which these decisions will be found in the published reports of this court. We have no objection to counsel citing the Pacific Reporter, but where any decisions of the Supreme Court of Oklahoma or of this court are relied upon the brief should cite the page and volume of the state reports upon which the case can be found. This will greatly expedite our work. We trust that the lawyers of Oklahoma will comply with this request in the future.

Second. Counsel contends that the judgment should be reversed in this cause because a plea was not entered to the indictment until after the jury had been impaneled and sworn to try the case. The record discloses that on the 5th day of April, 1910, defendant was duly arraigned and given 24 hours in which to plead, and that thereafter, on the 11th day of April, 1910, the case was regularly called for trial, and that the defendant appeared in person and by his attorneys and announced ready for trial, and that thereafter, on the 12th day of April, 1910, after the jury had been impaneled and sworn, the defendant refused to plead when the county attorney made his opening statement to the jury, and that the court thereupon ordered that a plea of not guilty be entered for him.

The general tendency of appellate courts now is to disregard technical objections which do not in any manner prejudice the substantial rights of the defendant. It appears that the defendant announced ready for trial without any objection being entered to his not having pleaded to this indictment; the record clearly showing that he was arraigned thereon. Some of the courts hold that where the record shows either an arraignment or a plea, but is silent as to one or the other, it may be presumed. *Steagald v. State,* 22 Tex. App. 464, 3 S. W. 771; *Wilson v. State,* 17 Tex. App. 525. Other cases also hold that the omission of the record to show arraignment and plea is not fatal, where the record shows that the issue was joined and a fair trial had without objection by the defendant. *Hayden v. State,* 55 Ark.

342, 18 S. W. 239; *State v. Bowman,* 78 Iowa, 519, 43 N. W. 302; *Commonwealth v. McKenna,* 125 Mass. 397; *Territory v. Shipley,* 4 Mont. 468, 2 Pac. 313; *Allyn v. State,* 21 Neb. 593, 33 N. W. 212; *State v. Brown,* 33 S. C. 151, 11 S. E. 641; *People v. Weeks,* 165 Mich. 362, 130 N. W. 699; *State v. Bunker,* 7 S. D. 639, 65 N. W. 34; *State v. Reddington,* 7 S. D. 368, 64 N. W. 170.

In *State v. Reddington, supra,* the Supreme Court of South Dakota, from which state our statute was taken, had the following to say:

"Considering the matters complained of in the order in which they occurred chronologically, we notice that the record nowhere states or affirmatively shows that the defendant, now plaintiff in error, was arraigned, or that he pleaded to the indictment. The statute requires that the defendant shall be arraigned (Compiled Laws, sec. 7263); that he shall plead; and that his plea shall be entered on the minutes of the court, or, if he refuse, that a plea of not guilty shall be so entered. *Id.,* secs. 7301, 7303, 7311. If the defendant was not in fact arraigned, and did not plead, it was a grave oversight on the part of the court. If he was arraigned and did plead, it was careless in the clerk not to have entered the fact and the plea. But the practical question now is: What is the legal effect, either of such omission in fact, or of such defect in the record? There are many reported cases of high authority squarely holding that omission to plead, or failure of the record to affirmatively show that the defendant was arraigned and did plead, are, upon review, fatal to a judgment of conviction; and such seems to be the established rule of the common law. Our own judgment fortified by many thoroughly considered and well-reasoned cases from courts commanding high respect, leads us to the conclusion that, under the law as it is in this jurisdiction, this ought not to be held an imperious and inelastic rule. We should say that it was error to try a defendant without arraignment and plea, and that a record is defective which does not affirmatively show such procedure was had; but error does not always justify reversal. Injury is presumed from error, but the presumption is undermined and destroyed by the positive showing by the record itself that injury did not and could not result from such error. By 'injury' is meant 'effect upon the result.' This is the well-defined doctrine of our statute, which allows the defendant to except 'to the decision of the court upon a matter of law by which his substantial rights are preju-

diced, and not otherwise' (Comp. Laws, sec. 7439), and which requires this court, on writ of error, 'to give judgment without regard to technical errors or defects, or to exceptions which do not affect the substantial rights of the parties.' *Id.,* sec. 7520. In this case the record does show that the defendant was present in court personally and by his counsel, and that he was ready for trial, and that the trial proceeded precisely as though the minutes of the court showed a plea of 'not guilty.' In *State v. Greene,* 66 Iowa, 11, 23 N. W. 154, the defendant did not plead, the taking and entering of his plea having been overlooked by the court, and yet the appellate court refused to reverse a judgment of conviction. It said: 'The case was treated, however, as though a plea had been entered. The allegations of the indictment were all regarded as having been denied by the defendant. The state was required to establish the charge in the indictment by the same character of evidence, and with the same certainty, which would have been required if the formal plea of not guilty had been entered. The defendant was permitted to introduce evidence to disprove the charge, and his counsel was permitted to argue the case to the jury on its merits, and the jury were required to determine it under the same rules which would have governed in its determination if the plea had been formally entered.' And this ruling was followed in *State v. Hayes,* 67 Iowa, 27, 24 N. W. 575, and again in *State v. Bowman,* 78 Iowa, 519, 43 N. W. 302. In *People v. Tower,* 17 N. Y. Supp. 395, the record did not show arraignment, or that defendant pleaded, or that any plea was entered for him. The court held that 'there was nothing in these omissions which tended to prejudice the rights of the defendant, and consequently they should be disregarded.' * * *

"We have drawn upon these authorities quite fully, and it is probable that further research would discover others on the same line to justify our conclusions that we ought not to follow the rigid rule of the common law under the plain instruction of our statute that judgment of conviction must not be reversed on account of error which does not prejudice the substantial rights of the defendant. Neither civil nor criminal cases are tried for the primary purpose of vindicating or exemplifying formulated rules of law or practice. The object of every trial is to get at the very right of the matter in controversy. Rules are intermediate and subsidiary to that end, and nonobservance of the incidental rule, not made mandatory by statute, which obviously did not in any manner interfere with the accomplishment of the very objective end of the trial, and so could work no injury

to the defendant, is no ground for setting aside the result of such a trial. In this case the record shows that the case was regularly reached for trial; that defendant was present in person and by counsel; that he was ready for trial; that the trial proceeded and continued to verdict, without objection, in every respect as though a plea of 'not guilty' had been made and properly entered; and that the jury was instructed that the defendant had plead 'not guilty,' and the nature and effect of such plea fully explained by the court to the jury. Under these circumstances we hold, after much deliberation, that the failure of the record to affirmatively show arraignment and plea does not entitle defendant to a new trial."

The views expressed above meet our entire approval, and are in strict harmony with the statutes of this state and the policy of this court.

Granting all that is contended for by counsel for appellant, the most that could be claimed in his behalf was that a mere irregularity had occurred at the trial of the cause. Counsel did not attempt to show how this irregularity did or could have influenced the jury in finding appellant guilty. It is not claimed that any additional burden was placed upon appellant, or that he was deprived of any substantial right, so far as establishing his innocence was concerned. The objection made is purely an abstract, technical proposition. A technicality has well been defined as a microbe, which, having gotten into the law, gives justice the blind staggers. This court, from the first, announced that it would not reverse a conviction upon any technicality which did not involve a substantial right. See *Campbell George v. United States,* 1 Okla. Cr. 307, 97 Pac. 1052, 100 Pac. 46; *Byers v. Territory,* 1 Okla. Cr. 677, 100 Pac. 261, 103 Pac. 532. We have invariably held to this doctrine since. We have also repeatedly held adversely to the contention now presented by counsel for appellant. See *Wood v. State,* 4 Okla. Cr. 436, 112 Pac. 11; *Johnson v. State,* 5 Okla. Cr. 1, 112 Pac. 760; *Spencer v. State,* 5 Okla. Cr. 7, 113 Pac. 224; *Hast v. Territory,* 5 Okla. Cr. 162, 114 Pac. 261; *Patterson v. U. S.,* 7 Okla. Cr. 272, 118 Pac. 150.

Third. Counsel next contends that the court erred in admitting the dying declaration of the deceased, upon the ground

that a proper predicate was not laid for the introduction of such testimony.

J. F. Murphy was placed upon the stand as a witness for the state. He testified that he was acquainted with the deceased, George Smith, during his lifetime and visited him just prior to his death. The record then proceeds as follows:

"Q. State whether or not he made any statement to you there with reference to whether or not he realized he was going to die. A. Yes; he did. Q. What did he say? A. Do you want me to tell what happened? Q. What he said with reference to his dying, that he was going to die. A. He said he was about dead; then that he was going to die. Q. State whether or not he made a statement to you about what time was it, do you say? A. It was —I don't know; 8 or 9 o'clock, somewheres along there. Q. State whether or not he made a statement to you there as to the manner in which this shooting, this difficulty, occurred—the killing. A. Yes. Q. What was the statement? (Defendant objects to the introduction of the statement, for the reason that no proper predicate has been laid for its introduction.) The Court: Is that all that was said? A. No, sir; that wasn't all that was said. Q. About dying? A. That is about all he said about dying—all I remember that he said about dying. (Objection overruled, to which defendant excepts.) Q. His statement to you then? Mr. Trice: Did you have any more conversations with him after you got this declaration from him? A. Before I— Q. After he made this statement to you you are fixing to tell about? A. There might have been a few more words. Q. Was the doctor there? A. Yes. Q. Had he already probed for this bullet? A. Yes. Q. Had he got it out? A. Yes. Q. Did Mr. Smith give vent to any expression that he had a hope of recovery? A. I don't know that he did. Q. Did you hear him say anything that would indicate his hope of getting well? A. No, sir. Q. Did you hear the doctor hold out any hopes to him of recovery? A. No, sir. Q. Did you hear anything said about his getting well? A. I don't remember. Q. Was he under the influence of stimulants or opiates? A. I don't know. Q. Judging from his appearance, if you could tell anything from that? A. I couldn't tell it if he was. Q. He wasn't at himself, but you would not know whether it was from the wound? A. He seemed to be kind of stupid. Q. You don't know what produced that? A. No, sir. Q. What about the condition of his mind, if you had occasion to observe that? A. His mind seemed to be good at the time he was talking. Q. Seemed to be at himself? A. Yes. Mr. Wood:

All right Mr. Murphy. A. You want me to tell just what occurred, what he said, I asked him? Court: Tell what he said with reference to this tragedy, and, of course, there might be some things that he said that wouldn't be admissible. You know about what would be permissible to testify to. A. The doctor told me that if I wanted to get a statement from him I had better do it, and I asked Mr. Smith if he wanted to make a statement, and he said he did; and the way that he started—the way that he started off and the way that he told it to me he asked me, 'Were you ever waylaid?' I said: 'No, sir; I never was.' 'Well,' he says, 'I was;' and he says: 'I was going down the road home, and Ed Ryan walked out into the road and says to me, "Say, you are the man that stole my horses and mules, or planned it to be done," and said that Mr. Ryan snapped at him, and he says, 'No, I haven't had anything to do with stealing your mules at all,' and said he told him—said, 'I am not armed, and you onghtn't to want to take the advantage of me in this way;' and Mr. Ryan said, 'You liar, you did,' and shot him, and that is about his statements to me."

It was previously proven that the deceased was shot between 5 and 6 o'clock in the evening, and immediately fell to the ground and had to be carried home; that he was visited by a doctor about 8 o'clock that night, who found that the deceased was shot in the stomach, the ball entering a little to the right and just below the breast bone, taking a downward course and lodging near his right kidney, from which place it was extracted by the doctor. It was also proven that Smith died that night.

George King testified for the state that he saw the deceased lying by the side of the road, where he was shot, and then proceeded to testify as follows:

"Q. What statement, if any, did you hear him make there? A. He told me— Q. With reference to whether or not he would live or die, or anything about his death, did you hear him say anything about that? A. Yes. Q. Tell what he said. A. He said Ed Ryan had killed him. Q. Had killed him? A. Had killed him. Q. Did he say anything there and then as to how long he expected to live, or did he make any statement with reference to that matter? A. Yes. Q. What did he say? A. He said that he was—when I first got there, I wanted to take him in; he told me he was cold, and I wanted to take him. Q. The house? A. Yes; and he begged me not to; said his wife was sick, and he didn't care about getting in where she could see him and take on

over him, and for me to get some more quilts and let him lie on that. Q. What more did he say, if anything? A. Well, I don't know as he said anything more, only that he told. me—I tried to reason with him that he wasn't killed, I knowed, because he seemed to be strong and talked well; and I told him maybe that he wasn't killed. I says, 'Maybe it ain't so bad.' He told me he was positive he knowed he was killed. He didn't want to go home. He told me that two or three different times, I guess. I insisted on taking him home. Q. Said he was killed? A. Yes; knowed it, and he wouldn't only live a very short time. Q. What statement, if any, did he make there in your hearing with reference to the manner in which this killing occurred? (Defendant objects. No proper predicate has been laid to introduce the statement. Objection overruled, to which defendant excepts). A. He told me he was waylaid and killed. Q. Did he say who did it? A. Yes. Q. Who? A. Ed Ryan. Q. Have you told all that he said with reference to the matter. A. No, sir. Q. Tell it all; just tell what he said as you remember it. A. He stated how he was shot. He said that he was going along there and was stopped, and that Mr. Ryan stopped him; and when he stopped him—I don't recollect just exactly the words he said when he stopped him, but there was a gun fired, and he says, 'Oh, oh, George, I didn't aim that,' and George begged; he says, 'For God's sake, Ed, you would not murder me here,' and then he said he just placed the gun up against him and fired the shot."

R. L. Morgan testified for the state as follows:

"Q. Did you see him the evening when he was shot? A. Yes. Q. Where was he when you saw him? A. He was at home. Q. Who was with you there? A. I and Mr. Murphy went over there together. Q. You are deputy sheriff? A. Yes. Q. Did you hear the deceased, George Smith? * * * Who else was there at the time you were there? Do you remember? A. I don't remember the names. I knew the parties, most of them. I believe Fussell. Q. John Fussell, witness in this case? A. I think so. Q. Any other? * * * Any doctor there? A. Dr. Filmore was in there. Another doctor. I didn't know his name. Q. Stranger to you. Hear the deceased make any statement? A. Yes. Q. What did he say? (Defendant objects, as no predicate has been laid.) Q. In what condition did you find him? A. He was just lying there on the bed, shot. Q. Did he make any statement as to that shooting? A. Yes. Q. What did he say? A. Said he was going to die and couldn't live long, I believe is the language he used. Q. Couldn't live long. What more did he say, if anything? A. I think Mr. Murphy asked

him if he wanted to make a statement. He told him he did. He asked Mr. Murphy if he ever was waylaid and shot, and Mr. Murphy told him 'No.' 'Well,' he says, 'I was,' and went ahead then and said that Ed Ryan shot him. Q. Do you remember what more he said, if anything, with reference to it? A. He said he told him not to shoot him; that he wasn't armed. Said he throwed the gun down on him, and it snapped. Said the next time the gun fired. That is the way I understood it, I think."

W. M. Hall testified for the state as follows:

"Q. Tell the jury in the words of Mr. Smith just what he said about this difficulty. A. He said that Mr. Ryan halted him and said— Q. Tell it like Mr. Smith said it. A. I am telling it as near as I know. Q. Was it in his words? A. He said that he was halted. Q. Who said he was halted? A. Said he was halted, and he said that Mr. Ryan shot, and he said, 'Oh, oh, I didn't go to do that,' or something similar to that. I don't know that is exactly it or not. And the next time it snapped, and he said, 'Ed, for God's sake, or God Almighty's sake, I haven't got anything to defend myself with;' something similar to that."

The admissibility of dying declarations has repeatedly been passed upon by this court. In the case of *Morris v. State,* 6 Okla. Cr. 41, 115 Pac. 1035, Judge Doyle, speaking for the court, said:

"It is essential to the admissibility of dying declarations, and is a preliminary fact to be proved by the prosecution, that they were made under a sense of impending death. This may be made to appear from what the injured person said or where, from the nature and extent of his injuries, it is evident that he must have known that he could not survive. It is sufficient if it satisfactorily appears that they were made under the sense of impending death, whether it be directly proven by the express language of the declarant, or be inferred from his evident danger, or the opinions of the medical attendants, stated to him, or from other circumstances of the case, such as the length of time elapsing between the making of the declaration and his death, and the fact that he declarant was so weak that he could not sign his name and so affix his mark, all of which are resorted to in order to ascertain the state of declarant's mind."

In the case of *Offit v. State,* 5 Okla. Cr. 49, 113 Pac. 554, Judge Armstrong said:

"A declaration made by deceased, clearly without premeditation or design, when the record shows he is mortally wounded, and he has made statements showing that he realizes his condition, are properly admitted as dying declarations."

. In *Blair v. State,* 4 Okla. Cr. 364, 111 Pac. 1003, Judge Richardson said:

"The deceased, shortly after the shooting, was found by two witnesses lying on the ground, covered with wounds made by 47 large-size shot, unable to move, and in a dying condition. They asked him what was the matter, to which he replied that he was dying. They then inquired, 'Did you see who shot you?' And he answered, 'Joe Blair; from ambush; two shots.' This was about 5 o'clock in the afternoon. The witnesses then procured a conveyance and removed the deceased to his home. On the way they met his sister, and the deceased said to her: 'Come kiss me, May; I'm dying.' And the deceased died that night a few minutes before 11 o'clock. These facts were given in evidence, and thereupon the court admitted as a dying declaration the deceased's answer to the question, 'Did you see who shot you?' This ruling of the court is assigned as error on two grounds: First, that it had not been sufficiently shown that the deceased was under a sense of impending death at the time he made the declaration; and, second, that the statement that Joe Blair shot him *from ambush* was a mere opinion or conclusion. As to the first ground, we think the evidence abundantly shows that the deceased was under the solemn conviction that death was impending. As to the second, we regard the declaration as a statement of fact and not a mere opinion. The witness said, in effect, that he saw who shot him; that it was Joe Blair; that the latter was in ambush and fired two shots; and every statement contained in the declaration, on its face was one of fact and not of mere opinion. Whether, if the declaration was the expression of an opinion based on personal knowledge or observation, and not a mere guess, it would have been competent, it is not necessary to decide. But see Wigmore on Evidence, secs. 1447 and 1918."

. We think that under the rules laid down in these cases the testimony objected to was all admissible.

Fourth. Appellant contends that the court erred in submitting to the jury an instruction upon the subject of manslaughter, upon the ground that appellant was either guilty of murder or nothing. There is evidence in this record, however, from which provocation can easily be inferred, and also evidence from

which may be inferred that the killing might have taken place when the defendant was overcome by a sudden heat of passion. The question raised is not new to this court. In fact, counsel representing this appellant has raised the same question in at least one other case presented to this court. See *Boutcher v. State,* 4 Okla. Cr. 576, 111 Pac. 1006. This court has repeatedly held that where there is the slightest evidence that would justify the giving of a manslaughter instruction, or would support such a verdict, the court should instruct the jury on the law relative to manslaughter. We do not think that the defendant should be heard to complain because the court took a very charitable view of the killing. This instruction upon manslaughter was a very merciful act toward this appellant; and we cannot see that this case should be reversed and sent back for a new trial for this reason, because we are satisfied that any honest jury, sworn to administer the law, could arrive at no conclusion other than the guilt of this appellant.

In the case of *John Hopkins v. State,* 4 Okla. Cr. 194, 108 Pac. 420, this court said:

"It is always the duty of the trial court to instruct on the law of manslaughter if there is any evidence that the alleged crime might have been done under circumstances that would reduce the crime from murder to manslaughter."

In other words, where there may be the slightest doubt in the mind of the trial court whether the crime was murder, then that doubt should be resolved in favor of the accused and a manslaughter instruction given.

We concur with appellant in believing that the testimony in this case would have supported a verdict for murder, but we cannot reverse a conviction because the jury has found a defendant guilty of a lesser degree of an offense than that of which, in our judgment, he should have been convicted. See *Burns v. State, ante,* 129 Pac. 657, decided at the present term.

Fifth. Appellant complains at the refusal of the trial court to submit special instructions requested. It is not error for the trial court to refuse to submit a special instruction, although it may be a correct statement of the law, where such instruction is not applicable to the evidence, or where the law governing the

question presented is correctly stated in the general instructions. We find that the general instructions contain all that was requested in the special instructions that was applicable to the evidence.

Sixth. Appellant at great length discusses alleged errors in the trial court's instructions to the jury. We fail to find, however, that exceptions as required by law were reserved to the instructions given. See *Boutcher v. State,* 4 Okla. Cr. 576, 111 Pac. 1006. In the absence of exceptions required by law, we can only examine the instructions given for fundamental error. We think the instructions are substantially correct.

Seventh. Appellant's motion for a new trial was overruled, and he was sentenced by the court on the 16th day of May, 1910. He announced his determination to appeal, and the preliminary steps for perfecting the appeal were taken, and appellant was admitted to bail to abide the final decision of this court upon this appeal. Eleven days later appellant filed a second motion for a new trial upon the ground of alleged newly discovered evidence. Waiving a number of objections which might be urged to this second motion, it is sufficient to say it is fatally defective in not stating fully the facts which would make the matters and things therein stated newly discovered; and there is no explanation as to why this alleged evidence could not have been discovered earlier by the exercise of proper diligence.

In the case of *Drew v. State,* 6 Okla. Cr. 348, 118 Pac. 677, Judge Doyle, speaking for this court, said:

"A motion for a new trial on the ground of newly discovered evidence, made before judgment, or after the term at which the defendant was convicted, is addressed to the sound discretion of the trial court and its ruling thereon will not be disturbed, except for an abuse of discretion; the presumption being that the discretion was properly exercised."

In the case of *Johnson v. State,* 5 Okla. Cr. 4, 112 Pac. 761, this court said:

"The defendant filed a motion for a new trial upon the ground of newly discovered evidence, and claims that if a new trial were granted him he would be able to prove by Mollie Ingram and Lou Johnson that the prosecuting witness in this cause was over 16 years of age at the time of the commission

of this offense. Defendant alleges that since his arrest on the charge of this case he has been confined in jail and been unable to make any inquiries with reference to the testimony in the case; that he has used all reasonable diligence in procuring evidence in his behalf; and that he did not discover the testimony of the said Lou Johnson and Mollie Ingram until after the conviction. Defendant stated that he had exercised due diligence in procuring testimony in his behalf before the trial began. This is merely the statement of a conclusion. Such an affidavit should state the facts, so as to enable the court to see that due diligence had been exercised. The record shows that the father of the defendant resided at Woodville. With the least effort on the part of the defendant or his counsel, he should have been in possession of the alleged facts set up in his motion for new trial long before the trial of this case took place. The record further shows that the verdict was rendered against the defendant the same day on which the motion for new trial was filed. No explanation was made as to how or why it was that the defendant could discover this testimony as soon as he was convicted, but could not find it out before the trial. Defendant had had a preliminary trial at which the state's evidence was introduced, and in which he was represented by the same counsel who represented him in the final trial. The town of Woodville is about fifteen miles from the county seat, where the trial took place. It is not alleged that counsel for the defendant even visited Woodville to make an investigation in behalf of their client; that the defendant or his counsel ever even requested the father of the defendant, who resided at Woodville, to make any investigation as to the facts of the case. They rested their defense entirely upon the hope that the jury would believe the testimony of the defendant rather than the testimony of the prosecuting witness. Under these circumstances it was too late, after the conviction, to begin to exercise that diligence which should have been exercised before the trial. Counsel cannot remain idle before a trial and, after there has been a conviction, discover evidence which they could have discovered prior to the trial by the exercise of diligence, and thereby obtain a new trial. The trial of a criminal case is a very serious matter, and the law requires that defendants and those representing them must be diligent in preparing to defend their cases. It is their duty to prepare their cases for trial before a conviction has been had."

In the case of *Slater v. United States,* 1 Okla. Cr. 278, 98 Pac. 111, this court said:

"In *Runnels v. State,* 28 Ark. 121, it is said: 'Applications for new trial on the ground of newly discovered evidence are to be received with caution, and this in proportion to the magnitude of the offense. The application should be corroborated by the affidavits of other persons than the accused, and, if possible, those of the newly discovered witnesses themselves, and it is not sufficient for the applicant to state that he did not know of the existence of the testimony in time to have brought it forward on the trial; but it must appear that he could not have ascertained it by reasonable diligence. *Pleasant v. State,* 13 Ark. 362; Graham & Waterman, New Trials, vol. 1, pp. 462, 485, and cases cited.' In *Twine, Saddler & Sawner v. Alice Kilgore,* 3 Okla. 643, 39 Pac. 389, Judge Burford said: 'An application for a new trial on the ground of newly discovered evidence must show that the appellant used diligence to procure and present the evidence upon the trial, and the facts showing due diligence must be shown, so that the court may determine whether the diligence used was sufficient. *Allen v. Bond,* 112 Ind. 523, 14 N. E. 492; *Hamm v. Romine,* 98 Ind. 77. There is no showing in the case at bar that the defendant used any diligence whatever to procure testimony upon which their motion for a new trial is based; nor is there any allegation to the effect that they had no knowledge of such evidence prior to the trial of said cause.' In *Flersheim Mercantile Co. v. Gillespie,* 14 Okla. 143, 77 Pac. 183, Judge Irwin said: 'The next assignment of error is that the court erred in refusing to grant plaintiff a new trial on the ground of newly discovered evidence. It is a well-recognized rule of this court that a new trial on the ground of newly discovered evidence will not be sustained, unless it affirmatively appears from the affidavit in support of such motion that diligence has been used to discover such testimony, and that the same could not have been discovered at a time prior to the trial by the use of reasonable diligence. In the affidavit in support of the motion for a new trial in this case, the general statement is made that the plaintiff and its attorneys have used every possible effort to ascertain the names of these witnesses and the facts whereof they would testify; but it does not appear by the affidavit what these efforts were, or in what manner or how they investigated or made inquiry to ascertain the facts.' The above cases present our views of the law upon this question clearly and fully. In this case the affidavit is silent upon the question of diligence. It is therefore fatally defective, and the trial court did not err in refusing to grant a new trial upon this ground. An affidavit for a new trial upon the ground of newly discovered evidence must set out the proposed evidence,

and it must be such as could not have been secured at the former trial by reasonable diligence on the part of the defendant, which fact should appear in the affidavit. If possible, it should be occompanied by the affidavit of the newly discovered witnesses."

See, also, *Harper v. State,* 7 Okla. Cr. 581, 124 Pac. 1116.

There are several other assignments of error which have been duly considered, but which we do not think are necessary to be discussed. We think the verdict is fully sustained by the testimony, and that no material error was committed upon the trial.

The judgment of the lower court is therefore, in all things, affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.