## W. A. WOODY v. STATE.

No. A-1830.   Opinion Filed November 22, 1913.

(136 Pac. 430.)

1. APPEAL — Presentation Below — Argument of Counsel—Instructions. (a) Before this court will review errors in the instructions of the trial court or objections to remarks made by the county attorney in his argument to the jury, unless such errors are fundamental, it must appear from the record that proper objections and exceptions were reserved to them during the trial.

(b) It is the duty of counsel for a defendant to call the attention of the trial court to what they consider to be errors committed during the trial and give the court an opportunity to correct the same at the time that they occur. Counsel for a defendant cannot remain silent and thereby acquiesce in the commission of errors and afterwards be heard to complain thereat, unless such errors are fundamental.

2. JUDGMENT—Acquittal of Codefendant—Res Judicata. Where a man and a woman are jointly prosecuted for adultery, one of the defendants may be acquitted and the other may be lawfully convicted.

3. APPEAL—Harmless Error—Evidence. Where the legal evidence in a case conclusively shows that a defendant is guilty, and where the jury could not rationally arrive at any other conclusion, ordinarily errors committed by the trial court in the introduction or rejection of evidence will become immaterial and will not constitute grounds for reversal.

4. ADULTERY—Evidence to Sustain Conviction—Sufficiency. For a statement of evidence which conclusively establishes the guilt of the defendant of the crime of adultery, see opinion.

5. TRIAL—Venue—Sufficiency of Evidence. For evidence which fully sustains the allegation of venue in a case of adultery, see opinion.

6.    APPEAL—Abstract Questions.  Where the record clearly shows
      that a defendant is guilty as charged, and where the defendant
      has not been deprived of some substantial right, to his injury,
      this court will not discuss and decide matters of law merely for
      the purpose of settling abstract questions.

7.    SAME—Grounds for Reversal.  The effect of a conviction upon
      the family of a defendant cannot be ground for a reversal.  Men
      with families should think of such things before they commit
      crimes.

8.    JUDGMENT—"Verdict of Not Guilty"—Res Judicata.  A "ver-
      dict of not guilty" is simply a verdict of not proven in the par-
      ticular case tried and is not a verdict of innocence, and hence is
      not conclusive against the state in favor of any other person
      than the defendant who was actually acquitted.

9.    ADULTERY — Evidence — Admissibility.  In a prosecution for
      adultery, evidence of a trip made to Kansas by defendant and
      the prosecuting witness' wife was properly admitted where such
      trip was a part of the general plan of the parties to have sexual
      intercourse and tended to explain the purpose of their being to-
      gether in Oklahoma under suspicious circumstances.

*Appeal from District Court, Major County;*
*James B. Cullison, Judge.*

W. A. Woody was convicted of adultery, and he appeals.
Affirmed.

*John V. Roberts* and *George W. Connell,* for appellant.

*C. J. Davenport,* Asst. Atty. Gen., for the State.

FURMAN, J.  First.  In their brief counsel for appellant
complain at a number of the instructions given by the court and
also complain of remarks alleged to have been made by the coun-
ty attorney in his closing argument to the jury.  Upon an exam-
ination of the record, we fail to find that any exceptions were
reserved at the trial to the instructions of the court.  We also
fail to find that counsel for appellant during the closing argu-
ment of the county attorney, in any manner, objected to the
remarks complained of in the brief and alleged to have been
made by the county attorney.  We find no fundamental errors in
the instructions of the court or in the remarks of the county at-
torney; and, in the absence of proper objections and exceptions,
we cannot consider the matters presented.  See *Hayes v. State,*
4 Okla. Cr. 377, 111 Pac. 1020; *Johnson v. State,* 5 Okla. Cr.

13, 113 Pac. 552; *Ford v. State,* 5 Okla. Cr. 240, 114 Pac. 273; *Crump v. State,* 7 Okla. Cr. 535, 124 Pac. 632; *Bethel v. State,* 8 Okla. Cr. 61, 126 Pac. 698; *Ryan v. State,* 8 Okla. Cr. 623, 129 Pac. 685.

Counsel should have promptly brought the matters complained of to the attention of the court at the time of their occurrence and thereby have given the court an opportunity to correct any errors, which may have been made, before they could have possibly harmed appellant. Counsel, being silent, thereby acquiesced in the commission of the errors complained of, even if it is admitted that they were errors. Unless errors committed during the trial are fundamental, counsel will not be heard to complain of that which, with reasonable diligence on their part, they could have prevented or properly incorporated in the record. Convictions in criminal cases will not be reversed upon afterthoughts unless for fundamental errors. It would be unfair to the trial courts and ruinous to the administration of justice to reverse convictions upon alleged errors which were not properly presented to the court below.

Second. Appellant and Anna Boyd were jointly charged by information with the commission of the crime of adultery. Anna Boyd was first tried and acquitted, and the contention is now made that this acquittal operated to discharge appellant as a matter of law. In their brief counsel say:

"We insist that where two parties are jointly charged with the commission of an act of adultery, the one with the other, it is impossible for one to be innocent and the other guilty, and for that reason, where the one is first tried separately from the other and found not guilty, it is the duty of the court to discharge the other. This may differ from the ordinary rule, but there is a reason for this being an exception. It is as impossible for the one to be guilty and the other innocent as it is for A. to be guilty of murdering B. and B. still living."

No authorities were cited by counsel for appellant in support of this proposition. It is true that the Supreme Court of North Carolina did so hold in the case of *State v. Mainor & Wilkes,* 28 N. C. 340, and also in the case of *State v. Parham,* 50 N. C. 416. We think that these decisions are not supported

by the reason of the law, and they were in effect repudiated by the same court in the later case of *State v. Cutshall*, 109 N. C. 764, 14 S. E. 107, 26 Am. St. Rep. 599.

A verdict of not guilty is not a verdict of innocence. It is simply a verdict of not proven in the particular case tried, and it is not conclusive against the state in favor of any other person than the defendant who was actually acquitted. The state might not be able to make proof of the offense in the trial of one party for many causes, yet might be able to make proof on the trial of the other. Because there may have been a miscarriage of justice as to one joint offender is no reason why there should also be a miscarriage of justice as to the other joint offender. Again, it is true that to constitute adultery there must be a joint physical act, but it is not necessary that there should be a joint criminal intent. The bodies must concur in the act, but the minds may not; one may be guilty and the other innocent. A few illustrations will demonstrate this conclusively. Namely, if A., being a married man, should have sexual intercourse with B., a single woman, who was so drunk or demented as to be unable to give her consent, such woman could not be convicted, but A. may be prosecuted and convicted either for adultery or rape. Or if A., being a married man, should marry B., a single woman, who had no knowledge of A.'s previous marriage, B. would not be guilty of any offense, but A. might be prosecuted and convicted either for bigamy or adultery. The following cases support the conclusion at which we have arrived: *State v. Ellis,* 74 Mo. 385, 41 Am. Rep. 321; *State v. Caldwell,* 8 Baxt. (Tenn.) 576; *Alonzo v. State,* 15 Tex. App. 378, 49 Am. Rep. 207; *Watson v. State,* 13 Tex. App. 76; *State v. Sanders,* 30 Iowa, 582; *State v. Donovan,* 61 Iowa, 278, 16 N. W. 130; *Commonwealth v. Bakeman,* 131 Mass. 577, 41 Am. Rep. 248; *State v. Eggleston,* 45 Ore. 346, 77 Pac. 738; *State v. Carrol,* 30 S. C. 85, 8 S. E. 433, 14 Am. St. Rep. 883; *Solomon v. State,* 39 Tex. Cr. R. 140, 45 S. W. 706.

Mr. Wharton says: "One defendant may be acquitted without involving the acquittal of the other."

Mr. Bishop says:

"As every offense to be punishable must be voluntary, so in particular must be adultery. But alike in adultery, and it is believed in fornication and incest, where the crime consists of one's unlawful carnal knowledge of another, it is immaterial whether the others participated under circumstances to incur guilt or not, just as sodomy may be committed with a responsible human being, or an irresponsible one, or a beast. Therefore the same act of penetrating a woman, who, for example, is too drunk to give consent, may be prosecuted either as a rape, or as adultery, at the election of the prosecuting power. There are cases which deny this and hold that adultery, fornication, and incest can be committed only with consenting persons, and what is rape cannot be one of the others. But they are believed to proceed partly, and perhaps entirely, on special terms of statutes. Certainly in principle they can have no other just foundation." (Bish. Stat. Crimes, sec. 660.)

Third. Objections were made to the action of the trial court in the introduction and rejection of evidence, but, in the light of the testimony in this case, we do not believe that an intelligent and honest jury could be impaneled who, with a due regard for their oaths and the testimony, could legitimately come to any other conclusion than that the appellant was guilty. This being the case, errors committed by the trial court, which could not have altered the verdict, became immaterial, and it would be a waste of time for us to discuss them. A conviction will not be reversed except for errors which affected the substantial rights of the defendant. See *Ostendorf v. State,* 8 Okla. Cr. 360, 128 Pac. 143.

Fourth. What are the facts in this case? In the case of *Ex parte Burris, ante,* 133 Pac. 1139, this court said:

"In determining the sufficiency of testimony in any case, the nature of the subject-matter under inquiry must be considered. It is but seldom, indeed, that direct and positive evidence of adultery can be produced, for persons who have illicit sexual intercourse with each other ordinarily do not commit adulterous acts in the presence of witnesses. Therefore in such cases we cannot reasonably expect to have other than circumstantial evidence as to the commission of adultery."

A more complete cable of circumstances could not be shown, short of proving by eyewitnesses the physical act of intercourse,

than is presented in this case. The prosecuting witness was Walter M. Boyd. He was a man 33 years old; was a clerk in a hardware store in Fairview. His wife, to whom he had been married several years, was 27 years of age. They had born to them one child, a girl three years old at the time of this trial. The defendant was a married man who came to Fairview in May, 1911, and was engaged in the general merchandise business. The defendant's wife spent only a portion of the time in Fairview with her husband. Defendant occupied a room over his store during his wife's absence. Boyd's house was within a few blocks of the defendant's store; the latter adjoining the Citizens' State Bank. Many merchants and officers of the bank testified that defendant often came to the bank corner, waved toward Mrs. Boyd's house, and in a few minutes Mrs. Boyd would appear. It was proved by witness that Mrs. Boyd often went up the front stairs leading to the floor on which defendant had his room and about the same time defendant went up the back stairs. It was proved that Mrs. Boyd and defendant were seen together after dark in front of defendant's store; at one time defendant was locking or unlocking the door. It was proved that defendant and Mrs. Boyd went driving together in a top buggy with the curtains drawn on warm days. It was proved that a friend of defendant advised defendant that his conduct would likely get him into trouble, to which defendant replied, "They can't prove anything." It was proved that defendant was seen at Mrs. Boyd's house, in the absence of Mr. Boyd, on several occasions; that he took a veil and hair braid to Mrs. Boyd. It was proved that on one occasion when defendant went to Mrs. Boyd's, Mr. Boyd's suspicions were aroused. He got a bucket and went to his home ostensibly to get a bucket of water. As he went in the front door defendant ran out the back door. On one occasion in the evening defendant was walking in front of his store. A man came up to him and sought to talk to defendant about some business. Defendant said to him, "Come Monday, I haven't time this evening." In a few minutes Mrs. Boyd appeared and met defendant. It was proved that the defendant visited Mrs. Boyd four or five times in Mr. Boyd's absence. On one occa-

sion, when Mrs. Boyd's sister (Mrs. Clough) was at Mrs. Boyd's, defendant told Mrs. Clough he did not want her "butting in." This was in answer to Mrs. Clough's request that defendant stay away from Mrs. Boyd's. About 8 o'clock one evening defendant and Mrs. Boyd were together by the Citizens' State Bank corner, standing close together. Mrs. Boyd said to defendant, "I will go if you think best, but I would rather not."

The date of the offense alleged in the information was September 23, 1911. The state proved that on that day Mrs. Clough, who was Anna Boyd's sister, and Anna Boyd were going to Carmen. They went down in town, spent some time in defendant's store buying various articles. They left defendant's store and went to the Bates' store. After being at the latter place for a while, Mrs. Boyd told her sister, Mrs. Clough, that she wanted to go back to the defendant's store to purchase other articles. She went there, taking with her the little baby girl, three years old. Mrs. Clough waited at the Bates' store for her sister. The latter not returning, Mrs. Clough went to defendant's store in search of Mrs. Boyd. She did not find either. At the time Mrs. Clough and Mrs. Boyd were in the defendant's store before going to the Bates' store defendant was there. Upon returning to defendant's store and not finding either Mrs. Boyd or the defendant, she went upstairs looking for her sister. Defendant's room on the second floor adjoined the rooms of a Mrs. Myers, who lived up there. Mrs. Clough went to Mrs. Myers, saw Mrs. Boyd's baby girl there, and inquired for her sister. What Mrs. Myers said is not in the record, but Mrs. Myers tapped upon the partition wall between her room and the defendant's room, and in a few minutes after this occurred Mrs. Boyd came into the room where she had left her baby girl. This occurred on September 23d. It was proved that Mrs. Clough and Mrs. Boyd went away that day on the train to Carmen. Mrs. Boyd got off there. Mrs. Clough went on to Winfield, Kan. The defendant the next day went to Carmen. On the train going there, he told a man who was riding with him that he was to meet a friend there. When the train got to Carmen, defendant got off, went into the station, and joined Mrs. Anna

Boyd, who was at the station. They got on the train together and went north. Defendant and Mrs. Boyd did go to Kansas, for witnesses saw them together on the streets of Wichita on the 25th and 26th of September, 1911. They remained in Kansas several days. They were seen at Anthony, Kan. About the 28th or 29th of September, 1911, they got on the train together at Anthony and came south into Oklahoma. Mrs. Boyd got off the train at Carmen. Defendant did not get off the train.

The information in this case was filed March 29, 1912. On the 15th day of March the defendant, while at Oklahoma City, called Mrs. Boyd by telephone. The telephone operator at Fairview knew the voice of both defendant and Mrs. Boyd. In that conversation defendant asked Mrs. Boyd if she had received a registered letter which he had sent her. She said: "No. I have not, but I think that I will today." He also wanted to know how everything was, to which she replied, "Everything seems to be at a standstill." On the 16th, the day after the first conversation, defendant called Mrs. Boyd by telephone from Oklahoma City and wanted to know if she had received the registered letter. She replied she had not. Defendant told her to come to Oklahoma City. She replied, "I am afraid to, because I am being watched here." Defendant then told her to go north and then come south. She then said, "I will meet you there at the depot at Oklahoma City." It was proved that she did go to Geary. She got off there, got a ticket to El Reno, and went there. The witness who testified to these facts was going to Ft. Worth. He got off at El Reno. The train he got off of went to Oklahoma City. Mrs. Boyd did not get off.

It was proved that defendant kept a keg of cider in his room, and there were empty whisky bottles. Mrs. Boyd often went upstairs and went back towards defendant's room. It was proved that the day before defendant's preliminary hearing the defendant and Mrs. Boyd met at the Citizens' Bank corner. This was before Mrs. Boyd was arrested.

There was in this case no semblance of a defense made. The material facts showing familiarities and illicit conduct were not in the least denied. We have asserted that certain facts were

proved. We do this because the defendant did not controvert them nor did he endeavor to do so. The witnesses were responsible and reputable men engaged in business at Fairview.

It is inconceivable that a man would be guilty of such conduct and yet hope a jury would be led to conclude that his constant familiarities with Anna Boyd were from a proper and good motive. Men of common sense were on the jury. For defendant to say that this line of conduct was not the gradual approximation to the ultimate end in view is to assume that the jurors who tried him were unable to look to facts and circumstances and reasonably conclude that his various acts were those of a destroyer of homes and the betrayer of his own wife and the degradation and moral pollution of the wife of Walter Boyd. Why would a man engaged in such a large and thriving business take such familiarities with the wife of his friend, unless he did so for the gratification of his lust? Why should he go to Boyd's home in his absence and, when Boyd approached, run out the back door, if his conduct was that of an innocent man? Why would he plan trips to Oklahoma City and to Kansas? Was it because of his pleasures in the association with Anna Boyd? No man of enough sense to be on a jury would believe that defendant was a victim of Anna Boyd and that she was exercising a hypnotic influence over him in order to secure from him such trivial gifts as veils and hair braids. Would an innocent man every day leave his business during business hours, go to the Citizens' Bank corner, and by signal secure the presence of Anna Boyd? Is it a coincidence that when Anna Boyd went up the front stairs toward his room he also went up the back stairs? Would this happen dozens of times without some prearrangement? Why would he say to Anna Boyd's sister to quit "butting in," unless he were engaged in the violation of the sanctity of the home of Walter Boyd? Where was Woody during the time Mrs. Boyd was in his room on the 23d day of September? It is true no witness swore that he was in the room. But he had been in his store a short while before. Anna Boyd went upstairs to the room adjoining the room of defendant. She left her baby girl with Mrs. Myers. Upon the arrival of Mrs.

Boyd's sister and an inquiry as to her whereabouts, Mrs. Myers tapped on the partition wall between defendant's room and Mrs. Myers' room. Anna Boyd appeared. Where had she been? No sensible juror would believe she was not in the defendant's room at that very time with the defendant. And it is urged that the *corpus delicti* was not proved. When have men become so insane that, if they are going to engage in such conduct, they commit such crimes in the open or where they are likely to be detected?

In prosecutions for adultery, evidence that the parties have been riding together frequently, that defendant paid frequent visits to the home of the woman when her husband was away, that the adulterous inclination existed, and that an opportunity for illicit intercourse occurred are facts which may lead the guarded discretion of a reasonable and just man to the conclusion of guilt. Greenleaf, Ev. (15th Ed.) vol. 1, par. 40; *People v. Gridler et al.* (Mich.) 31 N. W. 624; *State v. Briggs,* 68 Iowa, 416, 27 N. W. 358; *State v. More,* 115 Iowa, 178, 88 N. W. 323; *State v. Leek,* 152 Iowa, 12, 130 N. W. 1063; *Thayer v. Thayer,* 101 Mass. 111, 100 Am. Dec. 110.

In the last case cited the court says:

"The evidence by which the act of adultery is proved is seldom direct. The natural secrecy of the act makes it ordinarily impossible to prove it, except by circumstantial evidence. The circumstances must be such, indeed, as 'to lead the guarded discretion of a reasonable and just man to the conclusion of guilt.' But, when an adulterous disposition is shown to exist between the parties at the time of the alleged act, then mere opportunity, with comparatively slight circumstances showing guilt, will be sufficient to justify the inference that criminal intercourse has actually taken place. The intent and disposition of the parties towards each other must give character to their relations and can only be ascertained, as all moral qualities are, from the acts and declarations of the parties. It is true that the fact to be proved is the existence of a criminal disposition at the time of the act charged; but the indications by which it is proved may extend, and ordinarily do extend, over a period of time both anterior and subsequent to it. The rules which govern human conduct and which are known to common observation and ex-

perience are to be applied in these cases, as in all other investigations of fact."

This court in *Nettie V. Brown v. State,* 9 Okla. Cr. 382, 132 Pac. 359, said:

"We are not willing to establish the doctrine in Oklahoma that there can be no conviction for murder in any case unless the body of the deceased is recognized and identified by direct and positive evidence. Such a rule would make murder safe and would place a premium upon the most vile and brutal kind of assassination. All that the murderer would have to do to escape punishment would be to so mutilate and disfigure the body of his victim, which could be easily done, as to make identification and recognition impossible. Whatever the law in other states may be, this court will never consent to the establishment of a doctrine in Oklahoma which would result in such monstrous consequences. The only just and logical position consistent with the safety of society and the sanctity of human life which courts can assume is that the *corpus delicti* may be proven by circumstantial evidence."

In *Ex parte Harkins,* 7 Okla. Cr. 464, 483, 124 Pac. 931, 939, this court said:

"This is a case depending entirely upon circumstantial evidence. While, to a limited extent, a false consistency of circumstances may be constructed, yet experience teaches that this is almost impossible where there are a considerable number of circumstances involved. A single circumstance, standing alone, might amount to but little and be entirely consistent with innocence, yet, when this circumstance is considered in connection with other circumstances, they are to be taken and combined together and may result in an irresistible conclusion of the guilt of the accused."

And, in connection with this phase of the case, it ought to be borne in mind that the defendant could easily, if it were true, have proved that no crime was committed. It is, of course, true that the burden is upon the state, but as said by Chief Justice Shaw in *Commonwealth v. Webster,* 5 Cush. (Mass.) 316, 52 Am. Dec. 727:

"When pretty stringent proof of circumstances is produced, tending to support the charge, and it is apparent that the accused is so situated that he could offer evidence of all the facts and circumstances as they existed and show, if such was the truth, that the suspicious circumstances can be accounted for consistent-

ly with his innocence, and he fails to offer such proof, the natural conclusion is that the proof, if produced, instead of rebutting, would tend to sustain the charge."

From the evidence in this record the defendant is a guilty man. He has wrecked two homes and has brought shame and disgrace upon Anna Boyd's only child. Such an offender ought not to receive leniency at the hands of any jury or court.

Fifth. In their brief counsel for appellant say:

"There is much doubt as to the sufficiency of the proof as to the venue of the alleged crime, and, if so, the error is fatal. *Brunson v. State*, 4 Okla. Cr. 467 [111 Pac. 988]."

There is nothing in the record in this case or the authority cited supporting this statement. It was proved beyond question that Walter M. Boyd, with whose wife appellant has been convicted of adultery, resided in the town of Fairview in Major county. The jury were justified by the evidence in believing that appellant committed adultery, not only in the home of said Walter M. Boyd, but also in a room over the store of appellant, both of which places were in Major county, Okla.; but, even if there was any doubt upon the subject of the proof of venue, this could not avail appellant unless there was an absolute want of proof on this subject. In the very case cited by appellant this question is treated decisively in the following language:

"Only those allegations in an indictment which involve the guilt of a defendant are to be proved beyond a reasonable doubt. The venue of an offense does not come within this class, but there must be some proof of venue. See *Fuller v. Territory*, 2 Okla. Cr. 86, 99 Pac. 1098."

The evidence of the trip of appellant and the wife of the prosecuting witness to the state of Kansas, and what happened there between them, was competent and admissible in evidence because it was only a part of the general plan or conspiracy of said parties to have sexual intercourse with each other. It tended to explain the purpose of appellant and said Anna Boyd in being together under suspicious circumstances in Major county, Okla.

Sixth. We do not desire to be understood as indorsing every ruling made by the court in the trial of this cause. From

an experience of 40 years in the practice and on the bench, the writer doubts if such a thing as an absolutely flawless trial, from a technical standpoint, was ever had, where the defendant in a criminal case was represented by able counsel. Where it is clearly proved that a defendant is guilty as charged, a conviction should not be reversed unless it affirmatively appears from the record that the defendant was deprived of some substantial right, to his injury, upon the trial. To require perfection in all of the rulings of the trial court would simply be to render it impossible to enforce the law. The supreme question on an appeal is as to whether or not the material rights of the appellant were respected in the trial and as to whether or not the appellant is guilty as charged, and if this be clearly established, as is done in this case, immaterial errors, which, in the light of the entire record, could not have contributed to his conviction, should not be ground for reversal. The record fails to show that appellant was deprived of his substantial rights. There is but one construction, in the light of human experience and human nature, that can be placed upon the undisputed legal evidence in this record, and that is that appellant is guilty as charged. It would therefore be a useless expenditure of labor and consumption of time to consider the matters presented merely for the purpose of settling abstract questions of law.

Seventh. In their brief counsel for appellant say:

. "The conviction of Mr. Woody may mean the ruination of two families."

Appellant should have thought of these things when he was trying to seduce the wife of his neighbor. It is this, and not his conviction, that has ruined two families. The most sacred place this side of heaven is the home. There is nothing that is more ennobling to mankind than pure and virtuous homes. There is nothing more degrading to society than the pollution of the home. In such cases society inexorably punishes the woman. Not so with the man. Unless her father, brother, or husband personally inflict summary vengeance upon him, nothing but the strong arm of the law can make him atone for the crime which

he has committed. It is probable that considerations of this sort induced the jury to find the woman in this case not guilty. They doubtless realized that she was already more severely punished by society than she could possibly be by the law, and therefore followed the divine example in a similar case and said to her, "Go thou and sin no more." But what possible punishment could be inflicted upon the appellant, if not convicted by the jury? He would be absolutely at liberty to hunt for other victims to gratify his beastly lusts. While we do not indorse the acquittal of the woman, there was an element of justice in it; but, even if this be not true, appellant should not be freed because there was a miscarriage of justice in the case of the woman. There is no doubt in the world about his guilt. Society must have protection against such characters. The very life of society is involved in this question; and, if the law does not punish such conduct, who can blame the father, husband, or brother for taking the law into his own hands and defending the sanctity of his home with a shotgun. The only way to stop murder in such cases is for the law to firmly punish the offending party. The conviction of appellant meets our entire approval. We feel that justice has overtaken and marked its own. No country can rise superior to the purity of its homes; and, where any man for the purpose of gratifying his animal passions lays the unhallowed hands of lust upon the altar of marital purity, he thereby becomes a traitor to society and an enemy to the human race. This court has time and time again called attention to the fact that illicit love is the most prolific source of crime among men. Nearly every week the people are shocked by the publication of accounts of ruined homes and the commission of the crime of assassination caused by illicit love. This court is not going to condone such conduct. Leniency to these parties is a crime against society.

The greatest error in this record committed by the trial judge was that he allowed the kindness of his heart to cause him to fix the punishment of appellant at one year's imprisonment in the penitentiary and $500 fine, when in justice appellant should

have been sent to the penitentiary for five years, which is the limit of the law. This is the most flagrant case of its kind that has ever come before us.

Judgment of lower court is in all things affirmed.

ARMSTRONG, P. J., and DOYLE, J., concur.